(No. 55086.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. FREDERICK LEROY CHEEK, JR.—MICHAEL ASBELL, Appellee, v. STEVE BRIENEN, Sheriff, Appellant.

*Opinion filed November 18, 1982.*

Tyrone C. Fahner, Attorney General, of Springfield, and Ronald C. Dozier, State's Attorney, of Bloomington (Melbourne A. Noel, Jr., Michael V. Accettura, Val Gunnarsson, and Mike Weinstein, Assistant Attorneys General, of Springfield, and Robert J. Biderman and David E. Mannchen, of the State's Attorneys Appellate Service Commission, of Springfield, of counsel), for the People.

Daniel D. Yuhas, Deputy Defender, and David Bergschneider, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellee.

JUSTICE CLARK delivered the opinion of the court:

The relator, Michael Asbell, was arrested in Normal, Illinois, on March 16, 1980. He was not charged with any criminal activity in Illinois, but the State filed a complaint in extradition on March 24, 1980, requesting his commitment for not less than 30 days, to allow the Florida authorities to obtain a governor's warrant for extradition.

On May 5, 1980, the Governor of Florida filed a demand for the return of Frederick Leroy Cheek, Jr., a/k/a Mike Asbell, to Florida. A governor's warrant by Governor James Thompson was also filed on that date. The amended information and judgment of conviction which were attached to the complaint for extradition bore only the name of Frederick Leroy Cheek, Jr., and stated that the individual named had been found guilty of burglary and sentenced to 15 years' imprisonment. A fugitive warrant, which was also attached to the complaint for extradition, stated that Frederick Leroy Cheek, Jr., had escaped from the Florida Department of Corrections on September 25, 1979. The only underlying document to the governors' warrants that used the caption "Michael Asbell, a/k/a Frederick Leroy Cheek, Jr." was an affidavit from the Secretary of the Department of Corrections of Florida, Louie L. Wainwright, directed to the Governor of Florida, asking for a requisition upon the Governor of Illinois.

The Illinois arrest records listed relator's name as "Mike Asbell, a/k/a William Ballard," because when the relator was arrested in Illinois, he was driving an automobile which the police believed was stolen from Florida by William Ballard. No charges were ever filed against the relator in regards to the automobile. The record does not indicate why no charges were filed.

The relator filed two petitions for a writ of *habeas corpus*. One was filed on June 16, 1980, and the other on July 10, 1980. On August 20, 1980, a hearing was held on those petitions and the relator was discharged by the trial court. On appeal by the State, the appellate court upheld the trial court's order discharging the relator. (95 Ill. App. 3d 392.) The State filed a petition for leave to appeal (73 Ill. 2d R. 315(a)), which was granted.

On appeal before this court, the State asserts that the governors' warrants were in proper form and established

a *prima facie* case against the relator so as to shift the burden of proof regarding identification to the relator. The State further asserts that the trial court erred in discharging the relator because he failed to meet his alleged burden of proof. Lastly, the State contends that, assuming *arguendo* the burden of proof to establish the relator's identity was on the State, there was sufficient evidence to establish that the relator, Michael Asbell, was Frederick Leroy Cheek, Jr.

At the hearing on the *habeas corpus* petitions the relator testified that he was passing through Normal from Dania, Florida, on his way to Chicago when he was arrested. He testified that the police knocked on his motel room door and asked him if he was driving a 1977 Pontiac with Florida plates. He told them he was and they asked for his identification. The police called the police station and thereafter placed the relator under arrest. The relator testified that at no time was he told why he was being arrested.

The relator testified that his given name at birth was Michael Asbell. He further testified that he never used the alias Frederick Leroy Cheek, Jr., and denied that he had ever been convicted of burglary, sentenced to 15 years' imprisonment, or escaped from a Florida correctional institution.

The relator testified that he was living in Long Beach, California, on March 29, 1978, the date of Cheek's conviction, but was living in Florida on September 25, 1979, when Cheek escaped from the Florida penitentiary.

Since his arrest, the relator testified that he had been fingerprinted 14 times. The reason he was given by the correctional officers for the necessity of the duplicate fingerprints was that his first set of prints had not been "verified."

The State's first witness at the hearing was Randall Scott, a correctional officer for the McLean County sher-

iff's department. He testified that he had taken two sets of the relator's fingerprints in response to a request from his sergeant. His sergeant, he testified, had told him that Mr. Asbell's fingerprints had come back unclassifiable several times when they were submitted into a facsimile machine. Scott explained that the facsimile machine is a machine into which a person's fingerprints are submitted in order to obtain a proper identification. The fingerprints that are fed into the machine are compared with records kept by the Illinois Bureau of Investigation and the Federal Bureau of Investigation in an attempt to match them up and obtain a proper identification. Scott testified that he thought one of the sets of fingerprints that he had taken from Michael Asbell had come back classifiable, but he did not really know because he had not run the facsimile machine the day Mr. Asbell's fingerprints were allegedly sent.

Detective Charles Crowe, a 13-year veteran of the Bloomington police department, was called as the State's next witness. He testified that he had been a detective for eight or nine years and had received fingerprint training in 1974. His fingerprint training consisted of 80 hours of training in the classification and identification of fingerprints from the University of Illinois Police Training Institute. Crowe also testified that he had received certification two years earlier as a latent-print examiner, a certification which did not require an examination. Crowe had been qualified as an expert for purposes of court testimony on three prior occasions. Although Crowe estimated that he had compared latent prints with known prints approximately 150 times, some of them photostatic copies of fingerprint cards, he had never testified as an expert based on a photostatic-comparison examination.

Crowe testified that fingerprints are unique to each individual and that he had never encountered a situation where two individuals had the same fingerprints. When

comparing fingerprints, he testified, there is no standard number of points of similarity generally accepted as establishing an identification of a latent print; however, if there is any dissimilarity, identity is not established. Crowe testified that the FBI uses a 12-point test of similarity to make a positive identification. He explained that he uses a 10-point test because that is the standard that is relied upon by Bob DuBois from the Pekin Crime Laboratory.

Crowe testified that he examined and compared the right thumbprint of a fingerprint card containing the fingerprints of Michael Asbell taken by Officer Randall Scott on March 16, 1980, and the right thumbprint of a photostatic copy of the fingerprint card for Frederick Leroy Cheek, Jr., provided by the Florida authorities and attached to the Governor's warrant. He examined the prints for 15 minutes and found 10 points of similarity and no points of dissimilarity. The reason he compared the right thumbprints on each exhibit was because the photostatic copy of Frederick Leroy Cheek's fingerprints from Florida was blurred and smudged. Crowe's comparison of the thumbprints was limited to the top left portion of the thumbprints because even a portion of that print on the photostatic copy sent from Florida was blurred. Crowe testified that it was possible to make the identification even though the print was not the "clearest in the world." He testified that he had compared portions of latent prints in the past to make identifications. Crowe's opinion, based on his experience and training and his examination of the two prints, was that the thumbprints belonged to the same individual.

The State's next witness was McLean County Deputy Sheriff Robert Boyd. As part of his duties with the sheriff's department, Boyd testified that he was usually involved in all extradition proceedings in McLean County. On March 17, 1980, Boyd first became aware that an individual was being held who was claimed to be a fugitive

from Florida. Boyd then contacted Linda Hightower of the Department of Corrections in Tallahassee, Florida, and asked her to send a copy of their fugitive warrant and their governor's warrant for the person they knew as Frederick Leroy Cheek, Jr. Boyd received the warrants, and later received an envelope which contained a photograph which was marked, "Cheek, Frederick #063872." Boyd wrote a notation on the back of the photograph that indicated that he had received it on June 24, 1980, at 1 p.m., and put his name on it. Boyd testified that he showed the photograph and the envelope to the State's Attorney of McLean County and then put them in his file. Both exhibits, the photograph and the envelope, Boyd testified, were in substantially the same condition as when he received them. When Boyd was asked if he recognized the individual in the photograph, defense counsel objected on the basis of lack of authentication, and the trial court judge sustained the objection.

Boyd was also asked about a "rap sheet" from the FBI which allegedly was received by inserting Michael Asbell's fingerprint card into the facsimile machine. Boyd could not testify as to whether Michael Asbell's fingerprint card which was admitted into evidence was the fingerprint card which was submitted to the FBI computer for identification because he did not run the machine. The trial court sustained defense counsel's objection to the admission of the FBI rap sheet into evidence on the basis of lack of authentication.

The last witness that was called was Assistant State's Attorney Bradley W. Murphy. Murphy was called as a witness on behalf of the defense and testified that he had tried to obtain a witness from the State of Florida for the purpose of testifying as to whether Michael Asbell was Frederick Leroy Cheek, Jr., and had been unable to do so. He further testified that he had not received "the greatest of cooperation from anyone in the State of Florida in get-

ting identification witnesses" to come to Illinois and testify. Murphy testified that he thought that perhaps the lack of cooperation was due to the fact that the *habeas corpus* hearing was rescheduled a couple of times.

The trial court granted defendant's petition for *habeas corpus* discharge at the close of the hearing. The appellate court upheld the trial court's order discharging the relator, and it is from that ruling that the State is appealing.

Ordinarily, a governor's warrant for extradition which is regular on its face establishes a *prima facie* case for extradition against the person named therein. (*People ex rel. Maypole v. Meyering* (1934), 358 Ill. 589, 593.) If the person arrested has the same name as the name appearing on the governor's warrant, there is a rebuttable presumption of identity, and the arrestee then has the burden to show that he is not the person whose extradition is demanded. (*Newman v. Elrod* (1979), 72 Ill. App. 3d 616, 618, *cert. denied* (1980), 445 U.S. 942, 63 L. Ed. 2d 776, 100 S. Ct. 1338.) If the Governor inserts in the warrant a name or an alias different from that which appears on the face of the indictment or affidavit, the State has the burden of proving the arrestee's identity. *People ex rel. Maypole v. Meyering* (1934), 358 Ill. 589, 593-94.

It is true that the purpose of extradition is to summarily return a fugitive to the place of the alleged offense. (*People ex rel. Kubala v. Woods* (1972), 52 Ill. 2d 48, 53.) The demanding State certainly has an interest in obtaining a prompt return of its fugitives. The asylum State, however, also has a substantial interest in protecting people from unjustifiable extradition.

In *People ex rel. Maypole v. Meyering* (1934), 358 Ill. 589, the court addressed a similar situation to that in the instant case. The relator, Roy Maypole, was arrested in Chicago pursuant to a rendition warrant issued by the Governor of Illinois upon a requisition from the Governor of Ohio. The foundation of the rendition warrant was an

indictment returned in the court of common pleas of Cuyahoga County, Ohio, charging "Henry Burke" with burning a building for the purpose of defrauding. A copy of that indictment and a written request from the prosecuting attorney of Cuyahoga County were attached to the requisition. The written request by the prosecutor, directed to the Governor of Ohio, asked for a requisition upon the Governor of Illinois for the rendition of "Roy Maypole, alias Henry Burke." The Governor of Ohio patterned his requisition after the prosecutor's request and asked the Governor of Illinois for the rendition of "Roy Maypole, alias Henry Burke."

The relator in that case testified that he had never been known by the name of Henry Burke and denied that he had ever worked as a night watchman in the burned building, as it was alleged Henry Burke had. The State did not cross-examine the relator on these points and offered no evidence at all to contradict or impeach his testimony. The trial court remanded the relator to Ohio and a statutory writ of error was sued out by the relator to reverse that judgment.

On appeal, the court in *Maypole* held that neither governor could insert any name or names in the requisition or warrant, other than those which appeared on the face of the indictment or affidavit, without causing the burden of proof to be shifted to the State as to identity. (*People ex rel. Maypole v. Meyering* (1934), 358 Ill. 589, 594.) The court held that the State had not sustained its burden of proof because there was no evidence offered to establish that Roy Maypole was the same person as Henry Burke. The relator's testimony that he had never been known as Henry Burke therefore stood in the record as uncontradicted. The court thus held that, upon the record, the relator should have been discharged, and reversed the trial court's judgment remanding the relator to the State of Ohio.

In the instant case, as in *Maypole,* the relator's name differed from the name on the underlying charging instrument. In both cases the aliases were inserted by persons requesting the demanding State's governor to requisition the asylum State's governor to extradite a certain individual. The decision in *Maypole* was based upon the rationale that it would be inequitable to allow a governor to insert in a requisition or warrant any name or names other than those appearing in the original charging instrument without then requiring the State to sustain the burden of proving that these persons were one and the same. We adhere to the rationale which was established in *Maypole* and hold that where the name of the relator is different from the name on the charging instrument, the State should bear the burden of proof regarding the relator's identity. The State had the burden of proof as to identity in this case.

We turn next to the issue of whether the State sustained its burden of proof. The only evidence offered by the State which was admitted by the court was the fingerprint examination testimony of Detective Crowe of the Bloomington police department. A photograph and an FBI rap sheet were not admitted into evidence because the trial court judge sustained defense counsel's objections that the State had failed to authenticate either exhibit.

The photograph which was excluded from evidence was purportedly of Frederick Leroy Cheek, Jr. The State's witness testified that he received the photograph from the Florida authorities with the name "Cheek, Frederick" and a prison number on the back. The photograph was in an envelope which had the return address of the Florida Department of Corrections, but there was no letter inside.

Before a photograph is admitted into evidence a foundation must be established. (*Casson v. Nash* (1978), 74 Ill.

2d 164, 171.) Proof of the accuracy of a photograph may be established by the testimony of any competent witness who has sufficient knowledge to testify that the photograph fairly represents what it purports to portray. (*Brownlie v. Brownlie* (1934), 357 Ill. 117, 124.) Since the State in the instant case never produced any testimony to establish that the photograph was actually of Frederick Leroy Cheek, Jr., it was not authenticated and was properly excluded.

The FBI rap sheet was also properly excluded by the trial court. The testimony that was offered by the State did not establish that the rap sheet was received by actually feeding Michael Asbell's fingerprint card into the police facsimile machine. The record is so ambiguous that it is conceivable that the rap sheet was received by feeding the name Cheek into the facsimile machine. Since no one could actually say how the rap sheet was received, it was not authenticated and was properly excluded.

The last evidentiary issue that must be discussed then is whether the fingerprint evidence which was offered by the State was sufficient to sustain its burden of proof as to the relator's identity. Detective Crowe testified that he spent 15 minutes on the day before the hearing comparing Michael Asbell's fingerprint card to a badly smudged photostatic copy of Frederick Leroy Cheek's fingerprint card. The examination was limited to a small portion of the right thumbprint because that was the clearest fingerprint specimen Crowe could work from to make the identification. He was able to find 10 points of similarity between the two prints. He testified that if there had been one point of dissimilarity he would not have made the identification; however, he either was not able to, or did not, check any of the other prints or even another portion of the right thumbprint for a point of dissimilarity.

Since the State's evidence of identity was based solely on the fingerprint evidence, evidence which the trial court

obviously found unconvincing, we will not disturb the trial court's finding. The trial judge as the trier of fact is in a position superior to this reviewing court to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof. A trial court's evidentiary finding will not be disturbed unless it is manifestly against the weight of the evidence. *Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 110.

We conclude that the trial court's determination discharging the relator was correct.

Accordingly, for all the reasons stated, the judgment of the appellate court is affirmed.

*Judgment affirmed.*