(No. 61171.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DINO TITONE, Appellant.

*Opinion filed October 17, 1986.—Rehearing denied March 30, 1987.*

414

SIMON, J., dissenting.

Bruce Roth, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Thomas V. Gainer, Jr., and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

In an indictment returned in the circuit court of Cook County, Dino Titone (defendant), Robert J. Gacho, and Joseph Sorrentino were charged in eight counts with the murders (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)) of Aldo Fratto and Tullio Infelise, in two counts with the armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2(a)), and in four counts with the aggravated kidnaping (Ill. Rev. Stat. 1981, ch. 38, pars. 10—2(a)(3), (a)(5)) of the victims. Defendant, Gacho, and Sorrentino were granted severances, and Gacho and defendant were subsequently tried simultaneously before a single judge, with Gacho electing a jury trial and defendant choosing a bench trial. Defendant was convicted on all counts of the indictment. In a death penalty hearing requested by the People, the circuit court found that there existed one or more of the factors set forth in section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)) and that there were no mitigating factors sufficient to preclude a sentence of death. Defendant was sentenced to death, and the sentence was stayed (87 Ill. 2d R. 609(a)) pending appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d

R. 603). Holding that the convictions for armed robbery and aggravated kidnaping merged into the convictions for murder, the circuit court ordered those convictions vacated. This appeal involves only the conviction and sentence of defendant, Dino Titone.

The principal witness for the People at trial was Katherine De Wulf, who testified that between 10:30 and 11 p.m. on December 11, 1982, she received a telephone call at her home in Chicago from her boyfriend, Robert Gacho, who told her to come to his house because he needed "a back-up car." At approximately 1:45 a.m., she received a second call from Gacho, who directed her to wait five minutes, then drive to his house. As instructed, she drove to Gacho's house, parked in the alley at the rear, and waited. Gacho came out of the house, told her to wait, and went back into the house. Joe Sorrentino, who Ms. De Wulf had known previously and who was a friend of Gacho's, left the house, went around the front of the house, and returned to the alley driving a light blue Toronado. He told her to stay in her car, and reentered the house.

Shortly thereafter, Sorrentino again came out of the house; Fratto and Infelise, with their hands tied behind their backs, were with him. Ms. De Wulf recognized Fratto and Infelise from having seen them at Gacho's body shop. Defendant was walking behind Sorrentino, Fratto, and Infelise. Defendant motioned for Fratto and Infelise to get into the rear seat of the Toronado; defendant entered the passenger side and Sorrentino entered the driver's side. Gacho then came out of the house and entered the passenger side of Ms. De Wulf's car and told her, "They were going to have to waste 'em." Ms. De Wulf drove her vehicle and followed the Toronado being driven by Sorrentino. After a block or two, Gacho and De Wulf switched positions and Gacho drove. The two automobiles proceeded south on the

Stevenson Expressway (I-55) for approximately one-half hour, leaving the expressway at the Kingery Road exit. Gacho and Ms. De Wulf followed the Toronado down a gravel or dirt road for about 10 or 20 minutes and stopped when the Toronado turned down another road. Gacho told Ms. De Wulf they were waiting to hear shots. Ms. De Wulf testified she heard "several" shots. Defendant and Sorrentino returned to Ms. De Wulf's automobile and Gacho queried, "Is it over?" She testified that defendant responded, "They're gone, they're dead, he had shot them." Defendant also responded that Fratto and Infelise were begging him not to shoot them. At this, Sorrentino and defendant "just laughed."

Du Page County Forest Preserve Ranger Robert Stanton testified that at approximately 9:15 a.m. on December 12, 1982, he was patrolling the area of the Des Plaines River near Lemont Road when he observed a white automobile parked near the river. He approached the car and heard sounds coming from the trunk and a voice from the trunk saying, "I'm running out of air. Please get me out of here." Stanton radioed for assistance, and both the Lemont police and fire departments responded. Within a minute or two, the trunk was forced open and Stanton observed two people in the trunk, covered with blood, and with their hands tied behind their backs. He also saw a hand gun in the trunk. Paramedics then removed one victim, later identified as Tullio Infelise, placed him on a stretcher, and removed the cord from his hands. Stanton asked Infelise, "Who did this to you?" Although Stanton testified it was difficult to understand exactly what he was saying, Infelise responded, "Robert Gott or Gotch." When asked where Gotch could be found, Infelise responded, "Florida."

It was stipulated that Infelise remained at Good Samaritan Hospital in Downers Grove from December 12, 1982, until he died on December 28, 1982. Apparently

when the paramedics arrived at the scene, Fratto was dead.

An autopsy performed on Tullio Infelise showed that he died as a result of multiple gunshot wounds to the chest and abdomen requiring extensive surgical repair. The autopsy performed on Aldo Fratto showed that he died as a result of five gunshot wounds to the head, chest and abdomen. Forensic tests showed that the .38-special-caliber Smith & Wesson airweight-model revolver and the .25-ACP-caliber Raven Arms semi-automatic pistol found at the crime scene were used to inflict the fatal wounds. A latent fingerprint examination showed that the latent prints lifted from the crime scene were not defendant's.

Defendant contends first that he was not proved guilty beyond a reasonable doubt because the only evidence connecting him with the crimes was the uncorroborated testimony of an accomplice witness. He argues that Ms. De Wulf's testimony was suspect because she was an accomplice and the evidence shows that she had hopes of reward from the prosecution. He points out that when police officers came to her residence and asked her to go with them to the police station, she agreed; that the officers drove her vehicle to the police station while she rode with the officers in their vehicle; that at the police station she talked with police officers and assistant State's Attorneys who advised her of her rights in accordance with *Miranda*; and that she was photographed and fingerprinted by the police as though she were suspected of a criminal offense. They argue that her testimony that she was told that if she gave a statement she would not be charged with any offense, her testimony that she was later told that she would not be charged with any offense so long as she did not change her original statement, and her admission that she asked a police officer involved in the case for money,

show that she had hopes of reward. Defendant contends, too, that he was not proved guilty beyond a reasonable doubt because, assuming that Ms. De Wulf's testimony served to corroborate the evidence as to certain events relating to the murders, it did not corroborate evidence concerning the identity of the perpetrator. Finally, he argues that her testimony was not entitled to credence because "she testified she often used cocaine with Gacho during the course of their relationship."

The People argue that Ms. De Wulf's testimony was fully corroborated by the evidence that the following morning Aldo Fratto and Tullio Infelise were found at the crime scene in the forest preserve, locked inside a light-colored automobile; both men had been shot, but Infelise was still alive and able to tell the police that he had been shot by "Robert Gotch"; when Fratto and Infelise were discovered, their hands were tied behind their backs in the manner described by Ms. De Wulf. The People argue that she was neither offered a reward for her testimony nor threatened by the prosecution. They assert that she voluntarily went to the police station on December 12, 1982, was given her *Miranda* warnings, and provided detailed statements concerning the events of the previous night. They assert that after she recounted these events, it was obvious to the police that she had been "a mere unwitting participant" in the events and that no charges would be brought against her. Finally, as to Ms. De Wulf's drug usage, the People assert that she testified as to drug usage only during her relationship with Gacho, and there was no evidence of drug usage at the time of trial which would bear on the credibility of her testimony. As to her credibility in general, the People note the trial judge's comments that "although the influence exerted over her by Gacho evidently caused her at one time to make a contradictory statement to a defense attorney, it was for no other rea-

son than that, that that influence continued to exert itself."

Citing *People v. Ash* (1984), 102 Ill. 2d 485, defendant argues that "where a witness has hopes of reward from the prosecution, his testimony should not be accepted unless it carries within it an 'absolute conviction of its truth.' [Citation.]" (102 Ill. 2d 485, 493.) We find *People v. Ash* clearly distinguishable. In *Ash*, it was undisputed that the accomplice witness who implicated the defendants was seeking dismissal of some of the charges and a lenient sentence. He was also seeking to avoid incarceration with three persons against whom he had testified earlier. On cross-examination he stated that these individuals had "put out a contract" on his life and he "would do just about anything" to avoid being incarcerated with them. (102 Ill. 2d 485, 491.) He also freely acknowledged that he would lie to save his life, and he elected to testify only after the prosecution had threatened to rescind the plea agreements that had been negotiated. Here the police officers went to Ms. De Wulf's house and took her to the police station, and as she acknowledged, she voluntarily agreed to go with them. From the testimony it appears that the only thing asked of her in order to avoid being charged with a crime was that she tell the truth. Although we are hesitant to agree with the circuit court that Ms. De Wulf was "a mere unwitting participant," there is no evidence to show that by implicating defendant and his confederates, she had "hopes of reward from the prosecution." 102 Ill. 2d 485, 493.

We have considered and do not agree with defendant's contention that the fact that when Infelise was asked "Who did this to you?" he replied, "Robert Gott or Gotch," contradicts Ms. De Wulf's testimony and that it is evidence that he did not participate in the crimes. We need not engage in conjecture, but a number of rea-

sons suggest themselves for the deceased's failure to mention defendant by name. The deceased may not have known defendant by name, or he may have thought that the police, knowing of Gacho, would find his companion. The record shows, too, that Ranger Robert Stanton testified that it was difficult to understand what Infelise was saying because Infelise was "in quite a bit of pain and he was having a hard time breathing, and he was in shock from loss of blood," thus suggesting Infelise was too weak to speak more after implicating Gacho. We suggest these possible explanations for Infelise's implication only of Gacho, to demonstrate that the inferences to be drawn from this evidence are varied. Because a reviewing court might have drawn an inference different than that of the circuit court is not a basis for reversal.

We have considered defendant's contentions that Ms. De Wulf's testimony is incredible for the reasons that she had given a statement at the office of an attorney representing Gacho which was contrary to the one given the assistant State's Attorney, and that her admitted use of drugs showed her to be unworthy of belief. In assessing her credibility the circuit court said:

"She was a young woman who became involved with the Defendant Gacho, evidently enamored of him, and throughout the entire course of the events that the Court heard in this case, he used and manipulated her. But in spite of what she has been through with him, she was on the witness stand in this courtroom a thoroughly and completely credible witness.

The statement that she made to the police on the day after the murders is consistent with her testimony in this case. Her lineup identification of the defendant Titone the morning after the day after the shootings in this case is consistent with her testimony in this case and with the evidence.

Although the influence exerted over her by Gacho evidently caused her at one time to make a contradictory

statement to a defense attorney, it was for no other reason than that, that that influence continued to exert itself."

The record shows that nothing contained in the statement taken by the defense attorney referred to, or purported to change, her prior description of defendant's participation in the murders. Concerning her use of drugs, Ms. De Wulf testified that she used cocaine when she was with Gacho. She stated that at the time of trial she was not a cocaine user. It is peculiarly the prerogative of the trier of fact to judge the credibility of witnesses and draw conclusions based on all the evidence. (*People v. Cheek* (1982), 93 Ill. 2d 82, 94.) The findings and judgment should not be reversed unless the evidence is so improbable as to create a reasonable doubt of defendant's guilt. (*People v. Pittman* (1982), 93 Ill. 2d 169, 175; *People v. Yarbrough* (1977), 67 Ill. 2d 222, 227.) From our examination of the record we conclude that the evidence was sufficient to support a finding of guilty beyond a reasonable doubt.

Defendant contends next that the circuit court erred in admitting into evidence the court-reported statement given on December 12, 1982, by Ms. De Wulf to an assistant State's Attorney at the Burbank police station. This statement was consistent with her testimony at trial. Citing *People v. Clark* (1972), 52 Ill. 2d 374, he argues that evidence that she had made a prior consistent statement was admissible only if it served to rebut a charge or an inference that she was motivated to testify falsely or that her testimony was of recent fabrication. Defendant contends that Ms. De Wulf's testimony at trial was not a recent fabrication and that the motive to testify falsely was present when she made her statement at the police station. Defendant asserts that the police told Ms. De Wulf she would not be charged if she gave a statement, and this, he contends, shows her motive to

fabricate. Simply stated, defendant's contention is that the motive for fabrication was her desire to avoid prosecution, that it existed at the time the prior statement was made, and that the statement was inadmissible.

The People contend that Ms. De Wulf had no reason to fabricate her statement to the police because she was not offered any deal or threatened by the police in order to elicit the statement. The People assert that the focus of defendant's cross-examination of Ms. De Wulf was her statement given in the office of Gacho's attorney in which she claimed that her prior statement to the police had been a fabrication motivated by fear, and was a perversion of what she actually told the police and the assistant State's Attorney. The People argue that they introduced Ms. De Wulf's original statement to police in response to defendant's cross-examination and to refute defendant's theory that Ms. De Wulf's trial testimony had been a fabrication.

In *People v. Clark* (1972), 52 Ill. 2d 374, the court held that prior consistent statements are admissible to rebut a charge or an inference that the witness is motivated to testify falsely or that his testimony is of recent fabrication, and such evidence is admissible to show that he told the same story before the motive came into existence or before the time of the alleged fabrication. (52 Ill. 2d 374, 389; see also *Lyon v. Oliver* (1925), 316 Ill. 292, 303; E. Cleary, Illinois Evidence sec. 9.12 (2d ed. 1963).) The circuit court, in admitting the statement, apparently concluded that the motive for fabrication did not exist when the statement was made. On this record we are unable to say that in admitting the statement the court erred. *People v. Emerson* (1983), 97 Ill. 2d 487, 501; *Lyon v. Oliver* (1925), 316 Ill. 292, 303.

Defendant's final contention is that he was denied due process when the assistant State's Attorney was permitted, over defendant's objection, to elicit on cross-

examination that defendant did not tell the police that at the time of the murders he was playing cards at a friend's house. Citing *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, defendant argues that his right to remain silent was violated when the People were permitted to impeach defendant's exculpatory testimony by questioning him concerning his failure, at the time of his arrest, to tell the police where he was on the night of the murders.

The People contend that defendant was properly impeached with his failure to offer an exculpatory statement; that, as defendant acknowledged, he had voluntarily gone to the police to deny any involvement in the crime; that there was neither an "arrest" nor post-arrest "silence," within the meaning of the rule announced in *Doyle v. Ohio.* Citing *Jenkins v. Anderson* (1980), 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124, the People argue that where no governmental action induced defendant to remain silent before arrest, and where the failure to speak occurred before defendant was arrested or before *Miranda* warnings were given, impeachment by use of defendant's silence did not violate his constitutional rights. They assert that in *Jenkins* the court explicitly held that the *Doyle* decision has no application to cases involving prearrest silence. Alternatively, they argue that assuming, *arguendo*, defendant could have been considered "in custody" when he voluntarily went to the police station to deny involvement, under this court's decision in *People v. Rehbein* (1978), 74 Ill. 2d 435, the evidence was properly admitted. They argue that here, as in *Rehbein*, defendant was properly impeached because he had not remained silent and his failure to offer exculpatory statements to police at that time was not a normal or logical action.

Defendant contends, and we agree, that *Rehbein* is distinguishable. In *Rehbein* the People were properly

permitted to impeach defendant's trial testimony with proof of inconsistent statements and his failure to relate to the police the story which he told at trial. Here, defendant's statements to the police were consistent with his testimony.

The only evidence concerning the time at which defendant was arrested was his testimony that, after denial of any connection with, or knowledge of, the murders, he told the police that no further questions would be answered without his lawyer. The police then "started to get irritated" and arrested him. In our opinion, however, we need not and do not determine whether the silence occurred before or after arrest or whether admission of the testimony violated the rule of *Doyle*. Defendant was convicted in a bench trial, and the court "is presumed to have considered only properly admitted evidence and defendant was not prejudiced." (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 66.) Further, we hold the error, if any, to be harmless beyond a reasonable doubt.

In *People v. Knippenberg* (1977), 66 Ill. 2d 276, 287, the court said:

"Before a Federal constitutional error can be held harmless, the court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. (*Harrington v. California* [1969], 395 U.S. 250, 251, 23 L. Ed. 2d 284, 286, 89 S. Ct. 1726, 1727; *Chapman v. California* [1967], 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828.)"

The record leaves no doubt that the circuit court found the testimony of defendant and his alibi witnesses incredible. Under the circumstances, the single reference to defendant's failure to tell the police that he was at the home of a friend and not at the scene of the crime did not contribute to the conviction.

For the reasons stated herein, the judgment of the

circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order fixing Wednesday, January 21, 1987, as the date on which the sentence of death entered in the circuit court of Cook County shall be carried out at the Stateville Correctional Center at Joliet. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

The brief filed in this case by counsel for the defendant, who also represented the defendant at trial, differs markedly from those usually submitted in death penalty cases. Normally, such briefs raise numerous issues concerning the conviction, the sentence imposed, and the constitutionality of the Illinois death penalty statute. The defendant in this case, however, brings only three questions to our attention. Only five cases are cited in the defendant's main brief, and the argument portion of that brief comprises only 11 pages. Defense counsel has not raised a single issue relative to the death sentence, even though there is a serious question as to his effectiveness at the penalty phase of trial because he did not call any witnesses in mitigation. The failure to raise this oversight or constitutional objections to the Illinois death penalty statute may preclude the defendant from raising them on review in the Federal courts. In my opinion, a violation of the sixth amendment right to effective assistance of appellate counsel is demonstrated on the face of the defendant's brief. Rather than waiting for this is-

sue to be raised on post-conviction review, I would order new counsel appointed and set the case for a new briefing and argument.

On the merits, I disagree with the majority's conclusion that the defendant was proved guilty beyond a reasonable doubt. No physical evidence tying the defendant to the crime was produced; indeed, the fingerprints found at the crime scene were not Titone's. Victim Infelise named Gacho as the one who committed the crimes, but not Titone. The court speculates that perhaps the severely injured Infelise did not know Titone's name or thought Titone could be traced through Gacho, but an equally likely inference from Infelise's declaration was that Titone was not involved.

The only evidence against the defendant was the testimony of Kathy DeWulf. DeWulf admitted that Gacho told her as soon as he entered her car that they "were going to have to waste" Fratto and Infelise. She made no attempt to leave the car during the 10 minutes they sat outside Gacho's house. Without compulsion, she followed the vehicle containing the other alleged participants and the victims. At Gacho's request, she attempted to place his gun in her handbag during the drive, but found it would not fit.

DeWulf may well have been an accomplice to the murders since she knowingly supplied the "backup" or getaway car. But whether she was technically accountable for the actions of Gacho, Titone and Sorrentino does not appear to me controlling. She was certainly deeply enough involved to cast significant doubt on a story which tended to place the blame, at least for personally shooting the victims, on Titone and Sorrentino instead of on herself and her boyfriend, Gacho.

This is not a case in which the witness has voluntarily gone to the police in order to report her knowledge of and participation in a crime. Rather, some 16 hours after

the event, the police came to her house. She was transported to the police station, fingerprinted, photographed, and given *Miranda* warnings. DeWulf reasonably could have believed that she was under suspicion in the case. I do not understand how, based solely on the testimony of such a witness, the defendant could properly be convicted of murder.

In addition, the admission of DeWulf's prior consistent statement, given at the police station, constituted reversible error. As the majority recognizes, "such evidence is admissible to show that [the witness] told the same story *before* the motive [to testify falsely] came into existence or *before* the time of the alleged fabrication." (Emphasis added.) (115 Ill. 2d at 423.) Rather than applying this principle to the evidence introduced here, the court merely accedes to the ruling of the circuit judge, who "apparently concluded that the motive for fabrication did not exist when the statement was made." (115 Ill. 2d at 423.) I cannot conceive of any motive that DeWulf had to fabricate her trial testimony that did not also exist when she gave her original statement to the police, and the majority has identified none. The defense theory, and the thrust of its cross-examination, was that DeWulf implicated the defendant in order to avoid prosecution herself. Since this motive was present, if anything more forcefully, when she made her original statement to the police the night after the incident, the existence of that statement could not rebut the inference created by the defense that she was lying on the stand and served only to improperly bolster her testimony.

Finally, the majority's reasoning in sidestepping the *Doyle* issue is disturbing. The court holds that any error in permitting the prosecution to impeach the defendant with his failure to mention his alibi at the police station was of no consequence since in a bench trial the court is presumed to have considered only the properly admitted

evidence. That presumption only makes sense, though, if the evidence has been admitted without objection. Here the defendant lodged an objection, and the trial judge overruled it. "If the rule is applied as announced in the majority opinion we would reach the odd conclusion that the trial court is presumed to have disregarded evidence which it specifically believed to be competent ***." (*People v. Clifton* (1973), 11 Ill. App. 3d 112, 115 (Stouder, J., dissenting).) The majority's approach in effect eliminates the rule of *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, in bench trials.