THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JULIUS WATERS, Defendant-Appellant.

First District (3rd Division)  No. 1—91—2446

Opinion filed March 30, 1994.

Daniel D. Yuhas and Jeffrey D. Foust, both of State Appellate Defender's Office, of Springfield, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Eric R. Lifvendahl, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Following a bench trial, defendant Julius "Maurice" Waters was convicted of two counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)) and sentenced to 30 years' imprisonment with credit for 460 days previously served. On appeal defendant alleges that the prosecution committed reversible error by introducing irrelevant evidence of his gang affiliation at trial and failed to prove him guilty beyond a reasonable doubt.

We affirm the trial court.

On April 7, 1990, defendant was charged with two counts of first degree murder for the killing of Howard Lane (victim). Defendant filed a motion to quash arrest and suppress statements on December 11, 1990, which was denied after a hearing, and then waived his right to a jury trial. At the bench trial on June 14, 1991, the State presented the evidence that follows.

Tommy Langston testified that on April 7, 1990, his brother (victim) asked for an ounce of cocaine which he needed to give to defendant, their mutual friend. At 1 p.m., the victim left Langston's company to deliver the cocaine to defendant in an abandoned garage which served as a meeting place to deal drugs. Later that afternoon, Langston learned that defendant had shot an unidentified person in the garage and spoke with defendant about his alibi; defendant responded, "I got it together, I was on 74th and Ashland at that restaurant." Langston also testified that he saw defendant with a .38-caliber handgun a few days before the victim was shot and denied ever seeing the victim carry a gun.

Howard Lane, Sr., the victim's father, testified that on the morning of April 7, 1990, he and the victim discussed the condition of the brakes on his van. Later that morning, Lane heard the victim talking on the phone with defendant. While working on the van which was parked approximately half a block from the abandoned garage, Lane saw defendant walk toward him, exchange greetings and then continue towards the abandoned garage. When the victim came out of the house and asked Lane if he had seen defendant, Lane responded that defendant had walked towards the garage; the victim then headed towards the garage. Shortly thereafter, Lane heard a noise that sounded like a "pop" come from the direction of the garage; however, Lane did not see anyone leave the garage since he stood away from the entrance. After Lane finished working on the van, he picked up his wife and returned home, where the police and an ambulance were waiting.

Pearson Haynes testified that on the day in question, at approximately 1:30 p.m., he went to the abandoned garage to find the victim lying motionless on the floor and then called the police.

It was stipulated that the victim died from one gunshot wound to the head and that the bullet recovered from the victim's brain was a .38-special bullet.

The State next called Calvin Snipe, a 12-year-old boy who, with his brother, had been living with the victim's family for five months before the trial. Calvin testified that on the day in question he was playing basketball with three friends in an alley behind his friend Cory Robinson's house, which is located near the abandoned garage.

While the boys played and Calvin's brother Bryant watched the game, defendant approached and asked to take a shot at the basket, which he did before leaving in the direction of the garage.

Bryant Snipe, Calvin's nine-year-old brother, was found competent by the judge and testified to the events described by Calvin except to add that he saw the victim standing in the doorway of the garage, that he saw both the victim and defendant go into the garage and that about one minute later he heard a gunshot sounding from the garage. Bryant also testified that he did not see the victim leave the garage but saw defendant leave the garage and run towards 74th Street.

Chicago police detective Michael Kill testified that on the day in question he inspected the scene of the shooting before proceeding to the hospital where the victim was taken and then to the home of the victim's parents to inform them of their son's critical condition. With the information received from the victim's parents, Detective Kill then went to defendant's house and placed defendant under arrest. When questioned about the shooting, defendant told Detective Kill that he knew nothing about the shooting, was never near or even walked past the garage earlier in the day and did not have a gun or any gang affiliations. Detective Kill informed defendant that people had seem him in the vicinity of the garage that day, to which defendant stated that no one would have seen him shoot the victim in the garage since he was at home all day helping his grandfather.

Detective Kill also testified to a second and third conversation with defendant regarding the shooting during which defendant altered his earlier statement. During the second conversation, defendant stated on the day in question he received a phone call from the victim asking him to accompany the victim while delivering some cocaine and that later in the day someone named "Arvin" came to his house and told him that the victim wanted to see him. Defendant told Detective Kill that he went behind the abandoned garage to an empty lot, did not find the victim, walked down the alley to shoot some baskets with Calvin and Bryant Snipe and then went to a restaurant. Defendant also stated that he was a member of the Black Gangster Disciples street gang. When Detective Kill confronted defendant with the information that he had been seen in the area of the garage at the time of the shooting, defendant replied that no one could have seen him shoot the victim since "those kids were busy playing baskets."

During the third conversation, defendant repeated that the victim wanted him to go along to deliver some cocaine; however, instead of saying that "Arvin" stopped at his home, defendant again changed

his story to state that about 11:30 a.m. the victim called him and told him to meet at the garage. Defendant told Detective Kill he walked to the garage and on the way had a conversation with the victim's father before proceeding to the lot next to the abandoned garage, where he could not find the victim, so he shot some baskets with children playing in the alley, other than Calvin and Bryant Snipe, until he heard the victim call to him, at which time he met the victim in the lot next to the abandoned garage. Defendant said he and the victim talked without going into the garage, then the victim went home and defendant walked to a nearby restaurant where he arrived around noon. A few minutes later, defendant saw an ambulance and police going toward the garage on 74th Street. After Detective Kill stated that the police first arrived not around noon but at 2:30 p.m., defendant responded that after talking to the victim he had gone home and left his house around 1:45 p.m. to go to the restaurant. When asked if he ever had a gun for a third time, defendant stated, "Yes, I did have a gun" which he identified as a .38-caliber revolver.

On cross-examination, Detective Kill testified that defendant never denied shooting the victim, only that once defendant denied any knowledge of the shooting and twice stated that no one could have seen him shoot the victim in the garage. Detective Kill also stated that he never recovered a murder weapon or any of defendant's clothes with blood on them.

Defendant then presented two witnesses. Curtis Pulley, brother of Calvin and Bryant Snipe, essentially testified to a conversation he had with Bryant in which Bryant stated he saw defendant and the victim walk away from the garage. Cory Robinson testified that at the day and time in question he was playing basketball when defendant approached to shoot a basket before meeting the victim in the alley and then walking with the victim toward the garage; however, Cory stated that from where he stood he could not see the men enter the garage or hear noise from there, such as an argument between the men or a gunshot.

On June 14, 1991, the trial court found defendant guilty as charged and, after a hearing in aggravation and mitigation, sentenced defendant to 30 years' imprisonment with credit for 460 days previously served.

■ Defendant first argues that the State committed reversible error by presenting evidence of his gang affiliation where such evidence was not relevant to the issues. However, the record shows that defendant has waived this argument since he failed to object at trial or in a post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-87, 522 N.E.2d 1124.) Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a))

is a "limited exception to" the doctrine of waiver which allows a reviewing court to consider plain errors affecting substantial rights not properly preserved for review. (*People v. Herrett* (1990), 137 Ill. 2d 195, 209, 561 N.E.2d 1.) In *Herrett*, the Illinois Supreme Court stated that alleged errors would only be reviewed under the plain error doctrine in exceptional circumstances if (1) the evidence was "closely balanced" to preclude argument that an innocent person may have been wrongly convicted as a result of the error, or (2) "the error is so fundamental and of such magnitude that the accused was denied a fair trial." (*Herrett*, 137 Ill. 2d at 209-10.) Applying the plain error doctrine to the facts of this case, we do not believe reversible error occurred at trial.

First, the evidence cannot reasonably be regarded as closely balanced. In addition to defendant's contradictory accounts of his whereabouts on the day and at the time in question, the State presented several witnesses who not only placed defendant and the victim at the abandoned garage but also recounted hearing a single gunshot sounding in that direction and shortly thereafter seeing defendant run from the garage.

Specifically, Tommy Langston testified that on April 7, 1990, at 1 p.m. the victim told him he needed some cocaine to give to defendant, whom he would meet at the abandoned garage; two days earlier, Langston had seen defendant with a .38-caliber gun. Mr. Lane, Calvin Snipe and Cory Robinson all testified that they saw defendant in the vicinity of the garage shortly before the shooting. Defendant later admitted to Detective Kill that he met the victim at the garage that day, and Mr. Lane not only saw the defendant and victim near the garage but he also heard a single gunshot sounding from this vicinity soon thereafter. Pearson Haynes testified that at approximately 1:30 p.m. he found the victim alone in the garage, lying on the floor with a head wound from a gun later identified as a .38-caliber gun.

Moreover, because defendant was tried without a jury, we do not believe that the alleged error was of such magnitude to clearly deprive defendant of a fair trial. In a bench trial the court is presumed to have considered only properly admitted evidence and defendant was not prejudiced. (*People v. Titone* (1986), 115 Ill. 2d 413, 425, 505 N.E.2d 300 (prosecution's single reference to defendant's failure to tell police of his alibi amounted to harmless error), quoting *People v. Eddmonds* (1984), 101 Ill. 2d 44, 66, 461 N.E.2d 347.) To rebut this presumption, the defendant must show that the court actually used the improper evidence. See *People v. Schmitt* (1989), 131 Ill. 2d 128, 138-39, 545 N.E.2d 665.

Defendant has failed to make this showing. The evidence of

defendant's gang affiliation amounts to three isolated remarks which were not elicited by the State but came in while Detective Kill gave a narrative description of his investigation, including what defendant told him in the various interviews. The State did not attempt to prove defendant's gang affiliation represented a motive for the shooting. (See *People v. Smith* (1990), 141 Ill. 2d 40, 56, 565 N.E.2d 900 (the State need not prove motive to sustain a murder conviction).) Nor did the State use such affiliation to identify defendant as the offender. (See *People v. Gonzales* (1991), 142 Ill. 2d 481, 488, 568 N.E.2d 864 (evidence of gang affiliation may be relevant as part of a narrative describing events leading to a defendant's identification and arrest).) In fact, the State made no references to defendant's gang affiliation at any time during trial or closing argument. While we have previously shown our concern for the State's mention of gang membership for reasons unrelated to the crime (*People v. Colon* (1993), 249 Ill. App. 3d 141, 146-48, 618 N.E.2d 1067), the present controversy is clearly distinguishable. Hence, because the State did not present or rely upon the statements at issue to convict defendant and the record does not support a finding that the judge considered these statements in reaching his decision, defendant has failed to show that he was denied a fair trial to warrant a reversal under *Herrett*. Compare *People v. Easley* (1992), 148 Ill. 2d 281, 330, 592 N.E.2d 1036 (State's repeated references to defendant's gang affiliation to prove motive did not deny him a fair trial), with *Smith*, 141 Ill. 2d 40 (State's theory of gang-related motive which it argued extensively without evidentiary support denied defendant a fair trial).

■ Defendant next contends that he was not proven guilty of murder beyond a reasonable doubt because the prosecution's primary witness failed to provide credible testimony and the State only confirmed defendant's identity as the offender by circumstantial evidence.

The standard of review to be applied when a defendant challenges the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Campbell* (1992), 146 Ill. 2d 363, 374, 586 N.E.2d 1261, citing *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.) "This standard is applied in all criminal cases, regardless of whether the evidence is direct or circumstantial." (*Campbell*, 146 Ill. 2d at 374-75, citing *People v. Pintos* (1989), 133 Ill. 2d 286, 291, 549 N.E.2d 344.) This standard also gives " 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences

from basic facts to ultimate facts.' " (*Campbell*, 146 Ill. 2d at 75, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) Thus, a reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of witnesses nor reverse a conviction unless the evidence is so unreasonable, improbable or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Campbell*, 146 Ill. 2d at 375.

Defendant first challenges the sufficiency of the evidence on grounds that the State's primary witness, Bryant Snipe, was incompetent to testify and that his testimony was biased and uncorroborated. This argument fails for several reasons. First, the record shows that the trial court followed proper procedures in determining that Bryant was competent to testify although eight years old at the time of the shooting and nine years old at trial. (See *People v. Diaz* (1990), 201 Ill. App. 3d 830, 835, 558 N.E.2d 1363 (competency of a minor witness determined by his degree of intelligence rather than chronological age).) After finding Bryant competent, the court considered whether any bias or interest affected his testimony including the fact that Bryant and his brother Calvin lived with the victim's family for five months before trial, during which time they were provided with food and clothing. (*Cf. People v. Hughes* (1977), 51 Ill. App. 3d 985, 987, 367 N.E.2d 485 (trial court erred by excluding evidence of bias of the complaining witness who may have expected to recover medical expenses for injuries supposedly inflicted by the defendant).) Any confusion or contradiction in Bryant's testimony pertained to his credibility rather than affected his competency to testify. *Diaz*, 201 Ill. App. 3d at 835.

Defendant also fails to support his argument that the court based its decision upon unsubstantiated testimony. The record shows that prosecution and defense witnesses corroborated Bryant's essential testimony with regard to seeing defendant and the victim enter the abandoned garage and shortly thereafter hearing a single gunshot sounding in that direction.

Defendant's second challenge regarding the lack of physical evidence must also fail since the State produced enough circumstantial evidence to confirm defendant's identity as the offender. When confronted with circumstantial evidence in a criminal case, it is not necessary that the trier of fact be satisfied beyond a reasonable doubt as to " 'each link in the chain of circumstances' " so long as all the evidence taken together shows the defendant's guilt beyond a reasonable doubt. (*Campbell*, 146 Ill. 2d at 380, quoting *People v. Jones* (1985), 105 Ill. 2d 342, 350, 475 N.E.2d 832; see *People*

*v. Joe* (1991), 207 Ill. App. 3d 1079, 1082, 566 N.E.2d 801 (defendant proven guilty beyond a reasonable doubt of murder based on inference that he was at the scene with the murder weapon shortly before and after the shooting).) Although cases predicated upon circumstantial evidence may present greater challenges for the trier of fact, the court is not required to search out every possible explanation consistent with defendant's innocence and raise them to a level of reasonable doubt before convicting the defendant. *Campbell*, 146 Ill. 2d at 380, citing *People v. Rhodes* (1981), 85 Ill. 2d 241, 249, 422 N.E.2d 605.

Since the statements concerning defendant's gang affiliation did not prejudice the court, whose finding of guilty was supported by ample evidence to prove defendant committed the murder beyond a reasonable doubt, we affirm.

Affirmed.

RIZZI and CERDA, JJ., concur.