(No. 61294.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT GACHO, Appellant.

*Opinion filed February 11, 1988.—Rehearing denied May 31, 1988.*

222

224

226

228

SIMON, J., dissenting.

Robert Gacho, appellant *pro se,* and James J. Doherty, and Paul P. Biebel, Jr., Public Defenders, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Thomas V. Gainer, Jr., Kevin Sweeney and Renee G. Goldfarb, Assistant State's Attorneys, of coun-

sel), for the People.

JUSTICE WARD delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Robert Gacho, was convicted of the murder, aggravated kidnapping and armed robbery of Aldo Fratto and Tullio Infelise. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), 10—2(a)(3), 18—2(a).) The trial court had granted a pretrial motion to sever the defendant's trial from that of his codefendants, Joseph Sorrentino and Dino Titone. After the jury found the defendant guilty of the above charges, he elected to have the same jury sit in judgment at the death penalty hearing. The jury, finding no mitigating factors sufficient to preclude imposition of the death penalty, imposed the sentence of death. As this is an appeal of a death penalty sentence, this cause comes before this court on direct appeal. Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603.

Katherine De Wulf, the defendant's girlfriend, was the principal witness for the State. She testified that Gacho called her between 10:30 and 11 p.m. on December 11, 1982, and told her that she should drive to his house because he needed her to drive "a back-up car." He said he would call her later, which he did about 1:45 a.m., December 12, directing her to wait five minutes and then to drive to his house. She drove to Gacho's house and parked in the alley behind the residence and waited. She said she saw Joe Sorrentino come out the back door of Gacho's house with Infelise and Fratto walking behind him. She recognized Infelise and Fratto because she had previously seen them at Gacho's auto body shop. She testified that Fratto and Infelise had their hands tied behind their backs as they walked from Gacho's house with Sorrentino. Fratto and Infelise were seated in the back seat of a blue car, which Sorrentino then drove with Titone seated in the front passenger's

side. Gacho came from the house and came to De Wulf's car, seating himself on the front passenger side. De Wulf testified that she asked Gacho what was going on, and that he responded, "they would have to take them [victims] somewhere. He didn't know where, but they were going to have to waste 'em." De Wulf said she believed that "waste 'em" meant to kill them.

Gacho had a gun when he entered De Wulf's car, which he asked De Wulf to put in her purse, but she said the weapon was too large to fit into her purse. De Wulf then drove her car, following the vehicle driven by Sorrentino. After proceeding about a block or two, Gacho said he wanted to drive the car, and he switched positions with De Wulf. The two automobiles headed south on the Stevenson Expressway (I-55) for about one-half hour and left the expressway at either Cass or Kingery Road. The cars then traveled down a gravel or dirt road for about 10 minutes, and Gacho stopped the car. Gacho, according to De Wulf's testimony, told her they were waiting to hear gunshots, and she said she heard "several" shots within a few minutes. After hearing the shots, Titone and Sorrentino came to De Wulf's car and Titone reported that they had shot Fratto and Infelise and that they were dead. She said Titone also said that Fratto and Infelise had begged them not to kill them, but that Titone and Sorrentino had "just laughed" at the pleas. She said all four then drove back to Gacho's house and enroute the three men discussed cocaine, which Fratto and Infelise had brought to Gacho's home, but she could not recall what specifically was said.

A Du Page County forest ranger, Robert Stanton, was on patrol at about 9:15 a.m. on December 12, 1982, when he stopped by a parked automobile in the area of the Des Plaines River near Lemont Road. He heard someone pounding inside the trunk and calling for help. Stanton called the Lemont police and paramedics, who

arrived shortly thereafter and opened the car's trunk. Two men, both bloodied and with their hands tied behind their backs, were inside the trunk. One man, Tullio Infelise, was alive, and the other, Aldo Fratto, was dead when the trunk was opened.

The defendant made a statement to Assistant State's Attorney John Groark while he was in custody December 12, 1982. The defendant proofread his statement, made corrections to it, and signed it. Groark read the defendant's statement into the record at trial. In his statement, the defendant said that Sorrentino, Titone, Fratto, and Infelise had come to his house on the night of the murders. He said Fratto and Infelise came to his home to sell him cocaine. Gacho further said that the two victims came to his home with "three-quarters of a kilo" of cocaine, a balance-type scale (to weigh the cocaine), and guns. He said Titone and he pulled guns on the victims. He said he had carried a .357 magnum that evening and had put it under the front seat of De Wulf's car. When the defendant and De Wulf waited in De Wulf's car at the crime scene, he first heard three shots, then heard five more shots. Sorrentino and Titone had taken between $1,500 and $2,000 from the victims, of which the defendant got $500. Gacho and his two codefendants then divided up the cocaine at his home, with Titone taking about half; the rest of it was left at his house, but he had asked Sorrentino to take it with him.

The defendant testified at trial, denying any involvement in the murders. He said that he and De Wulf had dated for approximately 1½ years prior to the time of the murders. He said that he and De Wulf had broken up in October 1982, but that she continued to call him and come to see him at his auto body shop. He testified that, while he was in custody at the Burbank police station, a detective "kneed [him] in the back" near the right kidney area. He said one officer also slapped him, hit him in

the back, and threatened to take his wife and children away. He said the officers kept telling him that he had shot someone. He also testified that he made a statement to Assistant State's Attorney Groark, but it was simply a reiteration of the information that the two officers had provided him concerning the crimes. The defendant further testified that he did not tell Assistant State's Attorney Groark of the police punching him. He said he signed the statement only because he was "pressured" by the police.

Much of the other testimony at trial will be discussed in reference to the numerous issues raised by the defendant concerning the guilt/innocence phase of his trial. The jury returned a general verdict of guilty on all counts. The defendant was found subject to the death penalty and at the second phase of the sentencing hearing, the State offered in aggravation evidence from the trial and a conviction on a battery charge on September 7, 1982, a misdemeanor for which he was sentenced to one-year probation. In mitigation, the defendant emphasized that he had no significant prior criminal history, that he was not present at the commission of the crimes, and that he worked two jobs to support his wife and two children. The jury found that there were no mitigating factors sufficient to preclude imposition of the death penalty. The trials of Gacho and Titone were conducted simultaneously, with Gacho being tried by a jury while the judge heard the evidence against Titone. Titone's death conviction was affirmed by this court in *People v. Titone* (1986), 115 Ill. 2d 413. Sorrentino's sentence to life imprisonment was affirmed by the appellate court in a Rule 23 order on November 17, 1986 (107 Ill. 2d R. 23), and leave to appeal to this court was denied.

The defendant first argues that the detectives investigating the murders violated his rights under the fourth amendment by arresting him in his home without a war-

rant and without probable cause to believe that he had committed an offense. The defendant's contention was the subject of a pretrial motion to quash his arrest, which was denied.

Officer Stanton, who had discovered the car with the victims inside the trunk about 9:15 a.m., December 12, 1982, testified that, after the trunk was opened by the police, he had asked Infelise who had done this to him and that Infelise appeared to answer "Robert Gott or Gotch." Stanton, though, said it was hard to understand what Infelise was saying because he was in pain and having difficulty breathing. In response to Stanton's question asking where the man he named was located, Infelise answered "Florida."

Officer Robert Johnstone arrived at the scene about 9:30 a.m. and testified he asked Infelise how the injuries had occurred, and Infelise responded "Robert Gotch." He also learned from Infelise that a man named Dino and another named Joe were involved in the shootings. James Houlihan, an investigator in the homicide section of the Cook County sheriff's police, testified at the suppression hearing that when he arrived about noon at the crime scene, investigators Mark Baldwin and Johnstone had already interviewed Infelise. They told Houlihan the information they had obtained about the possible assailants, including that one was referred to as Bob Gacho. Houlihan and his partner later went to Chicago to meet with investigators James Coakley and Jerry Smith at the Area Three Violent Crimes facility. Coakley told Houlihan that he had had a conversation with Infelise at the hospital emergency room and that Infelise had named Robert Gacho and two other men named Dino and Joe as those involved in the shootings. From a police arrest record of Gacho, Houlihan also learned Gacho's address and description.

Houlihan then went to the house of Tullio Infelise to notify Mrs. Infelise that her husband had been shot. Tullio Infelise's brother, Frank, was also at the house and informed Houlihan that he knew Robert Gacho because he worked with another brother, Rosario. Frank Infelise thought his brother, Tullio, and his uncle, Aldo Fratto, had met Gacho at his house the night before, although he was not certain. Frank Infelise then went with Houlihan to Gacho's residence at about 2 p.m. When they arrived at Gacho's house, no one was home. They returned to Gacho's house about 40 minutes later where they saw a man on the front steps who matched the description of the defendant. Besides Houlihan, Officers Smith and Coakley and other investigators were present. After the police knocked on the door, the defendant came to the door and identified himself. At the investigators' request, Gacho came outdoors, was told the police wanted to talk to him about a shooting in Lemont, and was advised of his *Miranda* rights. He signed a consent form to allow police to search his house.

The defendant testified at the suppression hearing that seven or eight police officers arrived at his home on the afternoon of December 12. When he came to the front door of the house, three or four officers pulled him out of the house as soon as he opened the door. He signed a form that granted permission to the police to search the house, but the form was blank when he did so.

The trial court found that the police had "abundant probable cause" to arrest Gacho and that exigent circumstances existed to justify the arrest on the front porch of his house. A reviewing court will not disturb a trial court's ruling on a motion to quash arrest unless that finding is manifestly erroneous. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 485-86.) Probable cause exists where the police "have knowledge of facts which would

lead a reasonable man to believe that a crime has occurred and that it has been committed by the defendant." (*People v. Wright* (1985), 111 Ill. 2d 128, 145 (quoting *People v. Eddmonds* (1984), 101 Ill. 2d 44, 60, *cert. denied* (1984), 469 U.S. 894, 83 L. Ed. 2d 207, 105 S. Ct. 271), *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 179, 107 S. Ct. 1327.) Also, "In dealing with probable cause, *** we deal with probabilities. *** [T]hey are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (*Brinegar v. United States* (1949), 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310; see also *People v. Reynolds* (1983), 94 Ill. 2d 160, 166.) Our review of the record persuades us that the police had probable cause to arrest Gacho when they did. Much of the collective information known to the investigators in this case pointed to Gacho as one of the assailants. The surviving victim, Tullio Infelise, had told the first officer at the crime scene that a "Robert Gott or Gotch" was involved in the shootings and, responding to two other officers, gave the proper pronunciation of the defendant's name. Houlihan gathered more information from police records that showed that Gacho lived in the area of Infelise's house. Too, Houlihan was justified in relying on the information provided by Frank Infelise concerning Gacho's address and that he was pretty sure his brother and uncle met with Gacho the prior night. (*People v. Bean* (1981), 84 Ill. 2d 64, 68-69, *cert. denied* (1981), 454 U.S. 821, 70 L. Ed. 2d 93, 102 S. Ct. 106.) This information, gathered by various officers, would " 'warrant a man of reasonable caution in believing that *** the person arrested has committed the offense.' " (*People v. Shum* (1987), 117 Ill. 2d 317, 355, citing *People v. Blitz* (1977), 68 Ill. 2d 287, 292, *cert. denied* (1978), 435 U.S. 974, 56 L. Ed. 2d 68, 98 S. Ct. 1622.) As such, the trial court was correct in finding that the

warrantless arrest was supported by probable cause, and we cannot say its decision finding exigent circumstances was against the manifest weight of the evidence. *People v. Montgomery* (1986), 112 Ill. 2d 517, 528.

The defendant also argues that his rights under the fifth and sixth amendments were violated when he was interrogated after he requested an attorney. He claims that his testimony that he requested an attorney is un-contradicted and that continued interrogation was violative of his fifth amendment rights under *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880. The State first says the issue was waived by the defendant's failure to raise it in his motion for a new trial, and, secondly, the fact is that the defendant did not request an attorney.

The defendant testified at the suppression hearing that when he was brought into the interrogation room at the police station, the police began asking him questions. He said they asked him if he wanted an attorney, and he said he did. The defendant said he only signed a form waiving his rights because the police had told him to sign it. He further testified that the police continued asking him questions, and that he continued telling them he would rather talk to an attorney before answering. He said one officer repeatedly told him that he was involved in a shooting. He said the police slapped him, hit him, would not allow him to talk to an attorney, and instructed him not to tell Assistant State's Attorney Groark about being beaten. The defendant also testified he told Groark that he would make a statement after he was allowed to place a phone call. He said he made a phone call to a friend about obtaining an attorney. He told Groark that he had made the call, but did not tell him that he could not get through to his friend on the phone. He testified on cross-examination that he did not

tell Groark that he wanted an attorney, nor did he tell him that he wanted an attorney appointed for him.

Officer James L. Jordan testified at the suppression hearing that he took the defendant from his home to the Burbank police department facility at 4:15 p.m. He said he almost immediately read the defendant his *Miranda* rights, which the defendant acknowledged and then signed a written statement waiving those rights. The defendant said he would talk to the officer. Jordan testified he neither punched the defendant nor saw any other officer hit him. Another investigating officer, Thomas Adamski, testified substantially the same. He testified that the defendant gave his statement about 11:30 p.m., and he was present when the defendant and Assistant State's Attorney Groark signed it. Adamski said he heard both Jordan and Groark advise the defendant of his rights.

Groark testified at the suppression hearing that he first spoke to the defendant about 6:45 p.m., advising him of his rights under *Miranda*, and then speaking with him for about 20 minutes. According to Groark, the defendant later agreed to make a statement to police if he was first allowed to make a phone call. Groark testified that the defendant made the requested phone call and then made his statement. Groark said he did not see anyone strike the defendant, that the defendant did not request any medication, that the defendant did not complain of any physical disability, and that he did not threaten to lock up the defendant's wife or girlfriend.

The trial court denied the motion to suppress, finding that "the defendant's assertions and allegations appear unlikely and improbable." It is established that a trial court's ruling on a motion to suppress will not be disturbed unless it is manifestly erroneous. (*People v. Garcia* (1983), 97 Ill. 2d 58, 74, *cert. denied* (1984), 467 U.S. 1260, 82 L. Ed. 2d 856, 104 S. Ct. 3555.) Under

*Miranda* and its progeny, once an individual states that he wants an attorney, all interrogation must cease until an attorney is present. (*Miranda v. Arizona* (1966), 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627.) The defendant's assertion that his testimony concerning his requests for an attorney was uncontradicted is belied by the extensive record of the hearing on his motion. Not only did three persons testify they had either admonished the defendant or heard someone else admonish him as to his concerned constitutional rights, but the defendant admitted he never told Groark, the assistant State's Attorney who took his statement, that he wanted an attorney, and he signed a statement waiving his rights. The defendant said he wanted to first make a phone call, and by his own admission, he made the phone call, and then did not tell the officers that he could not get through to the party he said he was attempting to reach. The trial court was entitled, after observing the witnesses testify, to disbelieve the defendant's version of what transpired. There was no error in its ruling.

The defendant also contends that the trial court violated his rights under the sixth and fourteenth amendments by excusing prospective juror Thelma Jackson for cause. The defendant's argument is based on the following colloquy between the court and prospective juror Jackson:

"THE COURT: *** So do you know of any other reason why you couldn't be a fair and impartial juror?

A. No, but I do not think I believe in the death penalty.

Q. You do not believe that you could consider the imposition of it? Under any circumstances?

A. I would rather not.

Q. Well[,] is it that you couldn't?

A. Well[,] I mean if the circumstances were—No, I would rather not.

Q. Well[,] all right. We will excuse you for cause.

A. Okay. Thank you."

The State argues that, firstly, the issue is waived because the defendant did not object to the judge's excusal for cause, and that, on the merits, the prospective juror had in practical terms responded "no" to the judge's query of whether she could consider the imposition of the death penalty under any circumstances.

*Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, prohibits the exclusion for cause of prospective jurors who express only general objections to the death penalty. In *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852, the Court held that a juror may not be excused unless his or her views " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " We would observe that the defendant here did not object to the exclusion of juror Jackson. The failure to raise an issue in a written motion for a new trial generally constitutes waiver of that issue and it cannot be urged as a grounds for reversal on review. (*People v. Caballero* (1984), 102 Ill. 2d 23, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362.) An exception to the waiver doctrine is provided by our Rule 615(a) (107 Ill. 2d R. 615(a)), but that exception is expressly limited to cases in which the plain error affected substantial rights. Our decisions have held that, while the plain error doctrine may come into play when reviewing a sentencing hearing involving the death penalty (*People v. Szabo* (1983), 94 Ill. 2d 327, 355), issues which were waived will be addressed only when the evidence is closely balanced (*People v. Garcia* (1983), 97 Ill. 2d 58, 86-87). Even if an objection had been made here, the record shows a proper basis for the exclusion of prospective juror Jackson under *Witherspoon* and *Wainwright*. The challenge to a juror exclusion in *People v. Del Vecchio* (1985), 105 Ill. 2d

414, *cert. denied* (1985), 474 U.S. 883, 88 L. Ed. 2d 173, 106 S. Ct. 204, was based on a very similar response by the prospective juror. In *Del Vecchio*, the prospective juror said "I don't think I have the right to do that [impose death sentence]." This court decided there that the standards of *Witherspoon* had been met and that "the prospective juror's inclusion of 'I think' did not render his answers ambiguous. We are persuaded that regardless of what the evidence showed, he would have voted against the imposition of the death penalty, and we conclude that the circuit court did not err in excusing him." (105 Ill. 2d 414, 431; see also *People v. Brisbon* (1985), 106 Ill. 2d 342, 357-60, *cert. denied* (1985), 474 U.S. 908, 88 L. Ed. 2d 241, 106 S. Ct. 276.) Jackson responded here "No, I would rather not" when asked by the judge if she could consider imposing the death penalty under any circumstances. Jackson's responses to the court's questions demonstrate that her views concerning the death penalty would prevent or substantially impair the performance of her duties as a juror in accordance with the instructions and her oath. Jackson was properly excused for cause.

The defendant also contends he was denied a fair trial by the admission into evidence of an out-of-court statement made by Infelise nearly 6½ hours after he was shot. The challenged hearsay statement, naming "Robert Gott or Gotch" as the offender, was made to Officer Stanton at the scene of the crime when the trunk of the car was first opened by police and paramedics. Stanton testified that Infelise made the statement as a response to Stanton's question, "Who did this to you?" The trial court held the statement was admissible, qualifying as a spontaneous-declaration exception to the hearsay rule. The trial court determined that, although the statement came 6½ hours after the shootings, it was Infelise's first opportunity to speak after being confined, suffering from multiple gunshot wounds, in a locked car trunk. The State contends the

circumstances here show that Infelise's statement to Stanton was spontaneous and, as such, admissible.

For testimony to qualify as a spontaneous declaration and be admissible, three requirements must be met: "(1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence." (*People v. Poland* (1961), 22 Ill. 2d 175, 181.) The testimony concerning Infelise's statement that his attacker was "Robert Gott or Gotch" was properly admitted under the spontaneous-declaration exception to the hearsay rule. The occurrence was the multiple gunshot wounds and subsequent confinement in the trunk. This undoubtedly horrifying experience would produce an unreflected statement. Second, while the defendant correctly asserts that a rather lengthy interval elapsed—6½ hours—between the occurrence and the statement, we must reject his argument that the statement was not spontaneous. In both decisions relied upon by the defendant, *People v. Robinson* (1978), 73 Ill. 2d 192, and *People v. Jones* (1985), 105 Ill. 2d 342, the declarants had made the challenged hearsay statements after talking to other persons about the crimes. Infelise's response to Stanton's question was his first opportunity to speak with anyone after the period of confinement in a seriously wounded condition. Too, "[t]he time factor is an elusive element and will vary with the facts of the case." (*People v. Shum* (1987), 117 Ill. 2d 317, 343; *In re Hatfield* (1979), 72 Ill. App. 3d 249, 257.) The circumstances here show that Infelise was confined for 6½ hours in a car trunk, suffering from multiple gunshot wounds and the resultant blood loss, and suffering this horror with a dead man on a cold December night. We believe it is inconceivable, as the trial court ruled, that Infelise would have spent the time under these conditions to attempt to fabricate a story or statement about the event. Lastly, the statement admitted re-

lated to the occurrence. That the statement was made in response to a question about "who did this" does not necessarily destroy its spontaneity. (*People v. Shum* (1987), 117 Ill. 2d 317, 343; *People v. Damen* (1963), 28 Ill. 2d 464, 472.) As such, Infelise responded spontaneously to Stanton's query and the statement was properly admitted into evidence.

The defendant also contends that he was not proved guilty beyond a reasonable doubt of the murder of Infelise because the evidence was insufficient to show that the gunshot wounds were a contributing cause of death. The parties stipulated that Infelise was in the hospital from December 12, 1982, the day he was discovered in the car trunk, through December 28, 1982, at which time he died. It is the defendant's contention that the testimony of a medical expert left the relation of the gunshot wounds to the cause of death to mere inference and speculation. Conversely, the State argues that the medical examiner's testimony showed the multiple gunshot wounds inflicted upon Infelise were the cause of his death.

Dr. Lawrence Ariano, qualified to testify as an expert in the field of pathology, performed an autopsy on Infelise at Central DuPage Hospital on December 29, 1982. He testified that Infelise had a surgical scar on the right side of the chest and a vertical mid-abdominal scar, both of which showed healing. He also observed a rubber drain in the right upper quadrant, and evidence of "entrance-type bullet wounds" on the right shoulder, an area in the right axilla, and also on the right upper quadrant of the abdomen. Dr. Ariano found "two recent, small surgical incisions that were healing" in the right upper area of the back. He also testified he removed two bullets from near Infelise's spine area and the right flank area. His internal examination found numerous healing wounds near the small bowel, pancreas, and "massive bilateral thromboembolisms, blood clots that

occluded the major vessels of both lungs." He testified further about the thromboembolisms:

> "They are relatively common findings after major surgical operations in people who have had severe injuries such as I presume this man to have had based on the findings that I discovered both internally and externally.
>
> \*\*\* [I]n a young man like this, it would usually follow a surgical operation or severe injury, both of which he wound up having."

He further testified that the cause of death was multiple gunshot wounds of the chest and abdomen and the "mechanism of death" was massive, bilateral pulmonary thromboembolism. He defined "mechanism" of death as that "secondary set of causes that leads immediately up to the person's demise. \*\*\* [B]ut the first cause, the real cause, the proximate cause in this case was the gunshot wounds that were inflicted."

Gacho contends that the above testimony leaves to mere inference and speculation the causal relation between the criminal acts and the subsequent death. We recently addressed a contention similar to that of Gacho's in *People v. Brackett* (1987), 117 Ill. 2d 170, and we consider that that holding is controlling here. In *Brackett*, the defendant was originally charged with the rape, deviate sexual assault, and aggravated battery of an 85-year-old widow. About five weeks after the events giving rise to the original charges, the woman died. An autopsy determined that her immediate cause of death was asphyxiation from food being aspirated into her trachea. The defendant was then additionally charged with murder; he was convicted of murder, rape, and aggravated battery. He contended on appeal that he was not proved guilty of murder beyond a reasonable doubt because there was insufficient evidence to prove a criminal agency caused the woman's death.

This court noted that where criminal acts of the defendant have contributed to a person's death, the defendant may be found guilty of murder. "It is not the law in this State that the defendant's acts must be the sole and immediate cause of death. *People v. Reader* (1962), 26 Ill. 2d 210, 213." (*People v. Brackett* (1987), 117 Ill. 2d 170, 176.) The causal relationship is a question of fact that should be left to the trier of fact, and a reviewing court will not disturb the verdict unless the evidence is so unreasonable, improbable and unsatisfactory as to leave a reasonable doubt as to defendant's guilt. (*People v. Brackett* (1987), 117 Ill. 2d 170, 177, citing *People v. Molstad* (1984), 101 Ill. 2d 128, 133.) The uncontradicted testimony of the medical experts in *Brackett* showed that the victim, due to her broken rib and other injuries, was not able to breathe deeply to expel the food from her trachea nor was she able to be fed through a nasal tube. This court held that the defendant had set in motion a chain of events which contributed to the victim's death, and that the medical testimony provided sufficient proof of causation.

We consider that the testimony of the medical examiner here summarized a detailed internal and external examination of Infelise and supported the trier of fact's conclusion that the gunshot wounds contributed to Infelise's death. Dr. Ariano's uncontradicted testimony showed that Infelise had suffered multiple gunshot wounds, had had surgery as a result of the internal damage caused by the bullets, and that Dr. Ariano had actually removed two of the bullets post-mortem. He described the pulmonary thromboembolisms as a common result from the type of surgery and severe injury that Infelise had recently undergone. And, although he testified that the thromboembolisms were the immediate cause of death, he identified the gunshot wounds as the "first, or real cause" of Infelise's death. We believe that

the felonious acts of the defendant set in motion the chain of events which contributed to Infelise's death. The pathologist's testimony provided sufficient proof of causation between the defendant's criminal acts and the subsequent death of Infelise. The defendant's contention to the contrary must be rejected.

The defendant, citing *People v. Fiorita* (1930), 339 Ill. 78, and *People v. Evertson* (1923), 310 Ill. 397, next contends that a portion of the State's cross-examination of him was improper, beyond the scope of direct, and so irrelevant and prejudicial as to deprive him of a fair trial. He says the State exceeded the proper limits of cross-examination in two areas. He first challenges the cross-examination concerning whether he used cocaine and his frequency of use. The defendant believes these questions suggested he had committed crimes not charged in the indictment. The questions, as the State notes, were not objected to at trial and not raised in the defendant's motion for a new trial, thus waiving their review.

Another area of cross-examination challenged by the defendant concerns letters written by the defendant, while he was being held in Cook County jail prior to trial, to De Wulf when she was staying at his sister's home in Arkansas. De Wulf had testified that Gacho had asked her to stay away from the Chicago area until after his trial and had asked her in June 1984 to go to Arkansas to stay with his sister. The State cross-examined Gacho concerning the letters, which the State had introduced into evidence, asking if he had written to De Wulf, "I still believe I can escape from here one way or the other." The defendant objected, contending the State was introducing proof of another possible crime, and moved for a mistrial.

We consider that the trial court ruled correctly in allowing the above cross-examination. "[T]he scope of

cross-examination rests largely in the discretion of the trial court, and we will overturn its ruling only where an abuse of that discretion results in manifest prejudice to the defendant." (*People v. Wright* (1985), 111 Ill. 2d 128, 149, quoting *People v. Owens* (1984), 102 Ill. 2d 88, 103, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 362.) That the contents of the letter showed Gacho wanted to escape from jail was proper and relevant testimony as tending to show consciousness of guilt. E. Cleary & M. Graham, Handbook of Illinois Evidence §801.3, at 514 (4th ed. 1984); *People v. Gaines* (1981), 88 Ill. 2d 342, 366, *cert. denied* (1982), 456 U.S. 1001, 73 L. Ed. 2d 1295, 102 S. Ct. 2285; *People v. Harper* (1967), 36 Ill. 2d 398, 403.

The defendant further challenges the cross-examination concerning a letter from Gacho to De Wulf in which he said, "we were pushing the State and they might mess up." The examination continued:

"[THE PROSECUTOR]: Read the letter, Mr. Gacho. What are the first four words of that letter?

\* \* \*

A. 'Hi, Sweetheart. I love you.'

\* \* \*

Q. Did you later, in that same letter to this woman that you had no feelings for, say, 'The way I look at it, the State made just about their whole case around you. They were banking on you. Now, they are going to have to change their plans, and they don't have all that much time with all their other cases.' "

The defendant objected that the letters were not supposed to go to the jury, but "they are going to the jury line by line." The court ruled that evidence of the letters' content was permissible impeachment of the defendant's testimony concerning the nature of his relationship with De Wulf at the time of the murders and subsequent to his arrest. The cross-examination contin-

ued with the prosecutor asking, "Did you write, 'The [defense] lawyers set their case up knowing and hoping you wouldn't be in court'?" The court overruled the defendant's objection that the question went to defense plans and strategy. The defendant then answered the above question affirmatively. The defendant also responded affirmatively that he had signed the letter, "Love, your future husband[,] Bob."

We consider that the above sequence of questions concerning the letters from Gacho to De Wulf was proper impeachment of the defendant's testimony on direct examination. In cross-examining criminal defendants, it is proper to ask the witness questions that would explain, qualify, discredit or destroy his direct examination. (*People v. Williams* (1977), 66 Ill. 2d 478, 486-87.) The questions were a proper inquiry by the State to Gacho's testimony elicited on direct examination and go directly to his credibility on how he had described his relationship with De Wulf, the State's principal witness. The State characterizes the contents of the letters as an attempt to "affectionately" influence De Wulf not to appear in court to testify against the defendant. Our review of the record shows that the State's view is likely correct. Testimony is relevant and admissible that relates to any attempt by a party to conceal or, by threat or otherwise, to suppress evidence or otherwise obstruct an investigation. *People v. Gambony* (1948), 402 Ill. 74, 80, *cert. denied* (1949), 337 U.S. 910, 93 L. Ed. 1722, 69 S. Ct. 1045.

The defendant also contends he was denied a fair trial because the prosecutor was allowed to comment in closing argument on a hearsay statement by Infelise that named Gacho as one of the offenders, despite the trial court's ruling on a motion *in limine* to exclude the evidence. This argument concerns the testimony of Officer Coakley, who detailed the police investigation that led to the arrest of Gacho. He said he spoke to Infelise at the

hospital for three or four minutes on the morning of December 12, 1982, and he and his partner then went to Chicago to look for Robert Gacho. In a sidebar, the defendant objected, claiming that the testimony was indirect hearsay of Infelise's statement identifying Gacho as one of the offenders, and he moved for a mistrial, which was denied. The alleged error in allowing the above testimony was then compounded, the defendant asserts, because the prosecutor asked Gacho during cross-examination if he had heard Coakley testify that he went to look for him. During closing argument, the prosecutor summarized Coakley's testimony, saying he spoke to Infelise at the hospital, "getting that defendant's name from the lips of Tullio Infelise." The defense objection to this comment was sustained, but a motion for mistrial was denied. The prosecutor also said Coakley had gotten more detailed information from police records.

The defendant contends, relying on *People v. Spivey* (1978), 58 Ill. App. 3d 677, *People v. Warmack* (1976), 44 Ill. App. 3d 243, and *People v. Campbell* (1983), 115 Ill. App. 3d 631, that the claimed hearsay statement of Infelise to Coakley had been injected into the trial by indirection. We must reject the claim. Had the substance of the conversation that Coakley had with Infelise been testified to, it would have been objectionable as hearsay. The testimony of Coakley, however, was not of the conversation with Infelise but to what he did and to investigatory procedure. (*People v. Williams* (1977), 52 Ill. App. 3d 81, 87-88; see also *People v. Wright* (1974), 56 Ill. 2d 523.) As our appellate court stated in considering similar testimony, "Such testimony is not hearsay because it is based on the officers' own personal knowledge, and is admissible although the inference logically to be drawn therefrom is that the information received motivated the officers' subsequent conduct." (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 529; see also McCor-

mick, Evidence §248, at 587 (2d ed. 1972).) Coakley's testimony was properly admitted.

It was error for the prosecutor, during closing arguments, to say that Coakley had learned the defendant's name from the lips of Infelise at the hospital. On this record, however, it was not reversible error. There was no repetition of the improper remarks, as in *People v. Campbell* (1983), 115 Ill. App. 3d 631, 637, and the court immediately admonished the jury after the prosecutor's remark, saying, "I want to caution the jury that we rely on the Jury's recollection of the evidence that they heard, and any statement made by any lawyer that is not based on the evidence is to be disregarded." This was sufficient to cure any error. The plain error rule, as discussed previously, is invocable where the evidence is so closely balanced that it might be said that the jury's verdict may have resulted from the error. The evidence here cannot be said to be closely balanced.

The defendant next contends he was denied a fair trial through the admission into evidence of a prior consistent statement by De Wulf to bolster her credibility. The defendant also says it was improper for the prosecutor to comment on the statement during closing argument. Although the out-of-court statement was admitted into evidence, at the defendant's objection, it did not go to the jury. The statement, given by De Wulf on December 12, 1982, to an assistant State's Attorney at the Burbank police station, was nearly identical to her testimony at trial.

Much of the defendant's cross-examination of De Wulf attempted to show that she feared being charged with perjury if she changed her story from the original one she gave the assistant State's Attorney. De Wulf had also made an out-of-court statement to one of Gacho's attorneys about one week after her original statement to the assistant State's Attorney, which was admitted into

evidence. In her second statement, she claimed her original statement had been fabricated because she feared the police would arrest her. The defendant, relying on *People v. Clark* (1972), 52 Ill. 2d 374, argues that a prior consistent statement is admissible only to rebut a charge that at trial the witness is motivated to testify falsely or that the testimony is a recent fabrication. Evidence of the prior consistent statement is admissible to show that it was made before the motive came into existence. The defendant contends De Wulf had a motive to fabricate *before* she made the original statement as she wanted to avoid being charged as an accomplice to murder or for possession of cocaine at her residence.

Dino Titone, also charged with the murders of Fratto and Infelise, was tried simultaneously with Gacho. Titone waived trial by jury, and at their joint trial, the evidence was considered by the trial judge with respect to Titone, while the jury received evidence as to the defendant. Titone raised this issue on his appeal, but it was rejected. (*People v. Titone* (1986), 115 Ill. 2d 413, 423.) There, we held that the circuit court, in admitting the original statement, apparently concluded that De Wulf did not have a motive to fabricate when the statement was made. We said, "On this record we are unable to say that in admitting the statement the court erred." (115 Ill. 2d 413, 423.) Although a jury, rather than a judge, heard the evidence against Gacho, logic requires that the question be decided against Gacho, as it was against Titone. Proof of the prior consistent statement was proper as a means to rebut the defendant's claim on cross-examining that De Wulf's trial testimony had been fabricated to avoid being charged with perjury. *People v. Powell* (1973), 53 Ill. 2d 465, 474-75.

The defendant next argues he was denied a fair trial because the prosecutor cross-examined Mrs. Gacho on matters beyond the scope of direct examination. The

defendant also claims this was unfair because the prosecutor then impeached her with a prior inconsistent statement that incriminated the defendant, and the jury was not instructed that the prior inconsistent statement could not be used substantively.

On direct examination, Mrs. Gacho testified she went to the Burbank police station the night of December 12, 1982, where her husband was in custody, after the police had called her three times, asking about kidney medication for the defendant. She testified concerning her emotional state at the police station. On cross-examination, she was asked if the officers had asked her questions while she was at the police station. She said they had, although she said it was "more like they were telling me what happened and I was supposed to agree with them." She said she told the police her husband was at home with her and their children on the night the murders occurred. She further testified on cross-examination that she had told the police she did not know if anyone came to her house that night because she was in her bedroom, and she did not know if anything else occurred because she was sleeping.

Officer James Coakley was called by the State in rebuttal to Mrs. Gacho's testimony. He testified that Mrs. Gacho told him on December 12, 1982, while she was at the Burbank police station, that Sorrentino and Titone had come over to the Gacho residence about 9:30 p.m. on December 11. She told him that Sorrentino, Titone, and the defendant had sat in the kitchen talking for a while. Gacho later went to her bedroom and came back to the kitchen with a .38-caliber handgun, which he gave to Sorrentino. She heard only portions of their conversation in the kitchen, Coakley testified, but she could discern that they were talking about robbing Fratto and Infelise of cocaine. Fratto and Infelise arrived and the five men sat around smoking cocaine from pipes. According

to Coakley's testimony, Mrs. Gacho told him she cleaned the pipes in the bathroom, and she noticed when she returned to the kitchen that Fratto and Infelise were no longer there. Her husband told her the two men were in the basement; she went to her bedroom and awoke later to find the apartment empty. Coakley also testified he did not threaten to charge Mrs. Gacho at the police station or threaten to take away her children.

We consider that both the cross-examination and rebuttal testimony were properly admitted. As we stated above concerning the cross-examination of the defendant, cross-examination that explains, discredits, or destroys direct testimony is proper. On direct examination, Mrs. Gacho had stated her reasons for going to the Burbank police station, what she had seen there, and how she felt about the experience. The cross-examination focused on what happened at the police station, and specifically the conversation Mrs. Gacho had with investigators that evening. She had admitted talking to the officers, but denied making the statements which Officer Coakley later testified she made. The prosecutor laid a proper foundation to impeach through a prior inconsistent statement by directing the witness' attention to the time, place, and circumstances of the statement as well as to its substance. (*People v. Cobb* (1983), 97 Ill. 2d 465, 479.) Introduction of prior inconsistent statements, with the proper foundation laid, is proper cross-examination if offered for impeachment purposes, and not as substantive evidence. Admittedly, there is a danger that juries may consider impeaching evidence such as prior inconsistent statements to be evidence of the truth of the impeaching evidence. (*People v. Bradford* (1985), 106 Ill. 2d 492, 499.) There is no showing, though, that the State did not limit the use of this evidence here to showing her inconsistencies as to what occurred at the police station. Officer Coakley's testimony was admissible to show her

inconsistency and bias, but it was not admissible for the truth of the matters asserted in her statement. (*People v. Chupich* (1973), 53 Ill. 2d 572, 578-79.) The defendant did not tender a limiting instruction for the jury that Coakley's testimony was to be considered only for purposes of impeachment. We need not address the defendant's claim that it was error not to give the instruction, as any question on it was waived by his failure to tender a limiting instruction (*People v. Neal* (1985), 111 Ill. 2d 180, 201; *People v. Barnard* (1984), 104 Ill. 2d 218, 232), and raise it in his motion for a new trial.

The defendant also argues the trial court committed reversible error by admitting Mrs. Gacho's gun into evidence. The defendant says the gun, a .38-caliber Charter Arms revolver recovered from a bedroom dresser in the Gacho residence, had no connection to the crimes charged against him. He says the weapons actually used to shoot Fratto and Infelise—a .25-caliber automatic and a Smith & Wesson .38-special revolver—were recovered at the scene. Officer Coakley, who discovered the gun at the Gacho residence, testified that Mrs. Gacho had told him the gun belonged to her. Mrs. Gacho testified that she owned the revolver. The gun that the defendant had said he carried that night, a Colt Python .357 magnum, was also recovered at his home and admitted into evidence. The defendant says the admission of Mrs. Gacho's gun prejudiced his right to a fair trial as it was not sufficiently connected with the crime and the defendant to make it relevant evidence. (*People v. Jones* (1961), 22 Ill. 2d 592, 600.) The State correctly argues that, although admission of the gun was objected to at trial, it was not raised in the defendant's motion for a new trial, and is thus waived. *People v. Caballero* (1984), 102 Ill. 2d 23.

On another point, the defendant contends that the prosecutor deliberately elicited highly prejudicial, inadmissible hearsay into evidence, denying him a fair trial, and also

that, by doing so, the prosecutor violated the Code of Professional Responsibility. This argument concerns the testimony of Andre Watkins, an emergency medical technician at the Cermak Health Services, a facility of the Cook County jail. Watkins was called by the State as a rebuttal witness to the defendant's testimony that, prior to making his confession while in custody, he was struck in the right kidney area by several officers. Watkins testified as to his physical examination of the defendant on January 6, 1983, about three weeks after he was taken into custody. His testimony was based on a written report he had made of the examination. The report was not admitted into evidence, but was used to assist the witness' recall of the examination. When asked the name of the inmate appearing on his report, Watkins answered, "Robert Gacho, also known as Robert Gotch." The defendant immediately objected and, out of the jury's presence, moved for a mistrial. He argued that he was never known other than Robert Gacho. The judge denied the mistrial motion, but ordered the "also known as" testimony stricken and instructed the jury to disregard it. Watkins said on redirect that the report was in his own handwriting.

The defendant's assertion that the State has violated its obligations under the Code of Professional Responsibility apparently is based on a belief that someone other than Watkins placed the "also known as Robert Gotch" onto the report. We agree with the State's contention that the defendant's simply attaching the medical chart purportedly prepared by Watkins to the defendant's brief as an appendix was an improper means of seeking to supplement the appellate record. In any event, the report was not admitted into evidence, and it was not made a part of the trial record. We consider only that which appears in the record on appeal (*People v. Reimolds* (1982), 92 Ill. 2d 101, 106-07; *People v. Jackson* (1963), 28 Ill. 2d 37, 39), and there certainly is noth-

ing to support the defendant's claim that the words "also known as Robert Gotch" were placed on the medical chart by someone other than Watkins. The defendant had been shown the report in advance of the testimony, and when he objected strongly to the "also known as" testimony of Watkins, he did not at that time charge or suggest that the notation appeared to be written in a hand other than Watkins', nor did he raise it in his motion for a new trial. The question was waived for appeal. The testimony of Watkins was relevant and admissible, and he was in court subject to cross-examination. *Ashford v. Ziemann* (1984), 99 Ill. 2d 353, 364-65; *People v. Rogers* (1980), 81 Ill. 2d 571, 580.

The defendant next contends that the prosecutor's comments in rebuttal during closing argument concerning proof of guilt beyond a reasonable doubt improperly reduced the importance of proof beyond reasonable doubt. The prosecutor said:

> "Reasonable doubt. *** There's nothing magical about proving somebody guilty beyond a reasonable doubt. It happens every time a person is convicted in this courtroom. It happens in every courtroom in this building, in every criminal court building in this county, every county in this state and every state in this country."

The State properly points out that nearly identical remarks were made by the prosecutor in *People v. Collins* (1985), 106 Ill. 2d 237, 277, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267, and were held not to have reduced the State's burden of proof. Similar comments were also held proper in *People v. Bryant* (1983), 94 Ill. 2d 514, 523. The prosecutor's comments on the State's burden of proof here were not improper.

Having rejected the defendant's contentions of error at trial, we affirm his convictions. The defendant also claims there were serious errors relating to his sentencing hearing, most of which need not be addressed in

light of our conclusion that there must be a remandment for a new sentencing hearing.

The defendant contends he was deprived of a fair sentencing hearing because the prosecutor argued to the jury that, if it did not impose a sentence of death, the defendant might some day be paroled. Such remarks, the defendant says, are subject to a "strict scrutiny" review. (*People v. Walker* (1982), 91 Ill. 2d 502, 515.) He also argues that he was further prejudiced by the prosecutor's comments urging the death penalty as a means to prevent the defendant from injuring someone else in the future, including prison guards and fellow inmates.

The prosecutor said during rebuttal:

"Mr. McDonnell [defense attorney] has thrown about some very famous names—Gacy, Speck. Well, you know that Richard Speck was originally sentenced to death, and he comes up for parole every two years, and one day he is going to be out on parole.

MR. McDONNELL: I'm objecting to this."

The trial court sustained the objection and directed that the comment be stricken. The prosecutor continued:

"Well, Mr. McDonnell says put Robert Gacho away for life, and I say to you, what about the guards in the jail? What about their families, and what about even the fellow inmates? They deserve protection from a person who would go along with a deal—

MR. McDONNELL: Your Honor, I'm objecting to this type of argument.

THE COURT: Wait, wait. Objection sustained."

The prosecutor concluded his argument:

"Finally, ladies and gentlemen, on behalf of all of the People, I ask you to consider the opportunity that this man will someday have to hurt somebody else. That's one of the things you can consider. *** [A]nd consider that some day he may have that opportunity again.

MR. McDONNELL: Objection to this type of argument.

[PROSECUTOR]: Don't let him do that.

MR. McDONNELL: He's intimating he will be paroled and —

THE COURT: Overruled, overruled. Objection overruled."

The prosecutor's comments on the possibility of parole, together with the other objectionable comments, were improper and prejudicial, depriving the defendant of a fair sentencing hearing. This court has consistently held that argument by the prosecutor at a death sentencing hearing that raises the possibility of parole as a reason that the defendant should be sentenced to death is improper and prejudicial. (*People v. Szabo* (1983), 94 Ill. 2d 327, 366-67; *People v. Walker* (1982), 91 Ill. 2d 502, 515; *People v. Brisbon* (1985), 106 Ill. 2d 342, 366-68.) In *People v. Szabo* (1983), 94 Ill. 2d 327, the court stated that comments of that character divert the jury's attention from the aggravating and mitigating factors as it considers the record and the circumstances surrounding the crimes.

The *Szabo* prosecutor, in closing argument during the sentencing phase, extensively discussed the possibility that "some bureaucrat" could later decide to release the defendant on parole. This court said:

"The chance that 'some bureaucrat [may] decide to release' John Szabo was a factor that should not have been considered. In planting the seed in the jurors' minds the State's Attorney erred. The closing remarks of the State's Attorney in both his closing argument and rebuttal appealed to the passions and prejudices of the jury. The comments of the State's Attorney mandate the vacation of the death penalty. A penalty of death that could have been imposed under the influence of passion or prejudice cannot stand." (94 Ill. 2d 327, 367.)

The comments here were even more to be condemned because the prosecutor was aware, from discussions in chambers with the trial judge and defense attorney, that Gacho,

if not sentenced to death, would have to be sentenced to natural life imprisonment, with no possibility of parole or release, except through executive clemency. Gacho, who had been convicted of murdering more than one person, was required by statute to be sentenced to natural life imprisonment. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c); see also *People v. Taylor* (1984), 102 Ill. 2d 201, 209 (upholding the constitutionality of the provision for mandatory life imprisonment upon conviction of murdering more than one victim).) Despite this knowledge that a term of imprisonment and parole were not an option for this defendant, the prosecutor commented on parole possibilities and asked the jury "to consider the opportunity that this man will someday have to hurt somebody else." Comments which serve no purpose but to "inflame the [passion and] emotions of the jury are highly improper and have no place in the sentencing phase of a capital trial." (*People v. Lyles* (1985), 106 Ill. 2d 373, 406, *cert. denied* (1985), 474 U.S. 859, 88 L. Ed. 2d 141, 106 S. Ct. 171.) The comments here deprived the defendant of a fair sentencing hearing under the death penalty statute and require the vacation of the death penalty.

The State, relying on *People v. Garcia* (1983), 97 Ill. 2d 58, 88, contends that statements of the defendant's attorney during his closing argument invited the rebuttal comments of the prosecutor:

"MR. McDONNELL: Is Robert Gacho the kind of man that we have had in the history of the State of Illinois, a Gacy, or a Speck or a Heirens? You people know that he's not that type of man."

The defense attorney's comments certainly invited the jury to compare the defendant with the notorious murderers, but they did not invite the prosecutor to comment on the possibility of parole. Beyond that, they certainly did not invite the prosecutor to argue that a sentence other than death might endanger prison

guards, prison inmates or cause someone else to be injured. Those comments of possible criminal acts by the defendant, should he not be executed, were also improper, as this court held in *People v. Holman* (1984), 103 Ill. 2d 133, 164-65, *cert. denied* (1985), 469 U.S. 1220, 84 L. Ed. 2d 347, 105 S. Ct. 1204.

It is true, as the State points out, that there is no evidence that the possibility of parole was a factor considered in the jury's deliberations, as there had been in *People v. Walker* (1982), 91 Ill. 2d 502, but these highly prejudicial remarks came in closing argument at the sentencing phase of a case where the death penalty was sought. In *Walker* this court stated that the review of a death penalty case "demands strict scrutiny of such remarks and their possible effect upon the sentencing jury." (91 Ill. 2d 502, 515; see also *California v. Ramos* (1983), 463 U.S. 992, 998-99, 77 L. Ed. 2d 1171, 1179, 103 S. Ct. 3446, 3452.) We must reject the State's argument that the trial court's sustaining the objection and ordering that a portion of the comments be stricken cured the error. (*People v. Yates* (1983), 98 Ill. 2d 502, 538, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364.) The force of the prosecutor's comments on the possible future criminal conduct of Gacho clearly was that the jury, if it refused to sentence the defendant to death, would give the opportunity to the defendant to again kill or harm. "Unsupported predictions as to the kinds of crimes the defendant will commit if not executed are even more to be condemned than references to the possibility of parole, for they convey more directly to jurors the vivid, but misleading, message that the death penalty is the only way to protect society from the defendant and forestall his violence." (*People v. Holman* (1984), 103 Ill. 2d 133, 165.) The prosecutor's statements on this point and concerning parole could well have caused the jury to consider the death penalty as the only way to protect society from the defendant and diverted its attention

from the proper aggravating and mitigating factors. As a consequence, the death sentence must be vacated and the cause remanded for a new sentencing hearing.

The defendant makes numerous other complaints concerning his sentencing hearing, but as we have already determined that there will be a new sentencing hearing, it is necessary to address only those issues which might reappear at the new hearing.

The defendant argues that the trial court erred when it refused to instruct the jury that, in the case of multiple murders, the only alternative sentence to a sentence of death is a sentence of natural life imprisonment without the possibility of parole. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c).) In refusing to instruct, the court told defense counsel that he could inform the jury in closing argument that natural life imprisonment was the only sentencing alternative to death, but the court told counsel that he was not to mention parole. The defendant's attorney did state to the jury in closing argument that the defendant would have to be sentenced to life imprisonment, if the death penalty were not imposed. In instructing the jury, the court gave Illinois Pattern Jury Instruction, Criminal, No. 7A.15 (2d ed. 1981) (IPI), which provides that if the jury finds mitigating factors that preclude the death sentence, the court shall sentence the defendant to imprisonment. The State argues that the instruction was adequate, for this court in *People v. Albanese* (1984), 102 Ill. 2d 54, 81, *cert. denied* (1984), 469 U.S. 892, 83 L. Ed. 2d 205, 105 S. Ct. 268, and in *People v. Stewart* (1984), 105 Ill. 2d 22, 71, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666, held that there was no error in giving this standard IPI instruction without informing the jury that natural life imprisonment was the only statutory alternative to the death penalty for a multiple murderer.

The Court of Appeals for the Fifth Circuit, in *King v. Lynaugh* (1987), 828 F.2d 257, observed that jurors may harbor misconceptions about parole law, which may cause them to be biased in favor of capital punishment if the defendant is not allowed to inquire into their views on parole during the *voir dire*. In *King* the court was applying the law of Texas, which provides that a jury may not consider the possibility of parole in its deliberations on punishment. (*O'Bryan v. Estelle* (5th Cir. 1983), 714 F.2d 365, 388.) Although the *King* decision involved the *voir dire* stage of trial and not the sentencing stage, the opinion provides persuasive argument that a jury should be fully instructed as to sentencing options in a capital case. The court observed:

> "A juror might decline to impose the death penalty if the alternative were confinement of the criminal for life without possibility of parole because the general public would be adequately protected by such a life sentence. Similarly, a juror might decline to impose the death penalty on a particular defendant if he believed that the individual to be sentenced would no longer represent a menace if he were confined for at least twenty years without parole for the crime he committed. If, on the other hand, a juror believed it were likely—or even possible—that a convicted person would be released in a few years and the juror believed that the criminal would then still constitute a hazard to the public, that juror might conclude that only the death penalty would adequately ensure public safety." *King*, 828 F.2d at 260.

The standard IPI instruction given here, which states that if a sentence of death is not imposed, the judge will sentence the defendant to imprisonment, is not a complete instruction as to the statute in regard to a multiple murderer. A convicted defendant cannot be given imprisonment for a term of years, but is required by statute to be sentenced to natural life imprisonment. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c).) The jury here could

have reasonably believed, from the instruction given, that the defendant might be given a prison term of a number of years, rather than natural life imprisonment. That could have persuaded it that the death penalty was the only certain way to protect society from this defendant. The court's curiously allowing defense counsel to argue that life imprisonment was the only other sentencing option, and in effect having counsel rather than the court instruct the jury, did not rectify the error.

We observe further that the defendant's refused instruction itself was defective. It failed to state that natural life imprisonment may be commuted through executive clemency. The Unified Code of Corrections provides that, "No person serving a term of natural life imprisonment may be paroled or released except through executive clemency." (Ill. Rev. Stat. 1983, ch. 38, par. 1003—3—3(d).) In *California v. Ramos* (1983), 463 U.S. 992, 77 L. Ed. 2d 1171, 103 S. Ct. 3446, the Supreme Court said that to describe a sentence of life imprisonment as without parole "is simply inaccurate when the governor possesses authority to commute the sentence to a lesser sentence that includes the possibility of parole." An instruction stating that natural life imprisonment was the only alternative to the death penalty would be defective for failing to include that a term of life imprisonment may be commuted by the executive. An instruction in the case of multiple murders should state that if the jury finds mitigating factors sufficient to preclude imposition of the death penalty, the defendant will be sentenced to natural life imprisonment, and no person serving a term of natural life imprisonment can be paroled or released, except through executive clemency.

Our decision on this issue differs from what this court said in *Albanese* and *Stewart*. Under the supervisory authority inherent in this court, as well as that conferred by section 16 of article VI of the Illinois Constitution of

1970, we direct that after the date of this opinion the trial courts of this State, when conducting a sentencing hearing involving a defendant convicted of multiple murders, use the above jury instruction. *People v. Prim* (1972), 53 Ill. 2d 62, 76.

The defendant also contends that the trial court erred by giving the jury an instruction and verdict form at the death-eligibility phase of the sentencing hearing that permitted it to find Gacho subject to the death penalty, though the jury may have had a reasonable doubt whether Gacho intended that a life be taken. The defendant says that he may not constitutionally be sentenced to death "in the absence of proof that [he] killed or attempted to kill, and regardless of whether [he] intended or contemplated that life would be taken." (*Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368.) The defendant's reasoning under *Enmund* is that his conviction was obtained solely upon the theory of vicarious liability under the felony-murder doctrine and that such a conviction may be gotten without a showing of intent upon the defendant's part to kill or cause great bodily harm. He contends that, because the jury returned a general verdict finding him guilty of murder and of the two predicate forcible felonies, it is "impossible to determine if the jury found a reasonable doubt on the question of the defendant's intent to kill."

The defendant's argument does not convince because the jury, in the death-eligibility phase of the sentencing hearing, was given Illinois Pattern Jury Instruction, Criminal, No. 7A.11 (2d ed. 1981), which states that the defendant is liable for the death penalty if convicted of murdering two or more persons, so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts. At the conclusion of the eligibility phase, the jury agreed that this aggravating factor existed. Thus, it is clear that the jurors,

who also had sat at the guilt/innocence phase, judged the murders to be intentional acts. Too, the recent Supreme Court decision in *Tison v. Arizona* (1987), 481 U.S. 137, 95 L. Ed. 2d 127, 107 S. Ct. 1676, which is cited by the State as additional authority, defeats the defendant's argument that he is not subject to the death penalty because he did not specifically intend to kill the victims and did not inflict the fatal gunshot wounds. The court held in *Tison* that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement for imposition of the death penalty. (*Tison v. Arizona* (1987), 481 U.S. 137, 158, 95 L. Ed. 2d 127, 145, 107 S. Ct. 1676, 1688.) The evidence here leaves no doubt that Gacho was a major participant in the murders of Infelise and Fratto and had shown a reckless indifference to human life.

For the reasons given, we affirm the defendant's convictions, but we vacate the sentence of death and remand the cause to the circuit court of Cook County for a new sentencing hearing.

*Judgments affirmed;*
*sentence vacated;*
*cause remanded.*

JUSTICE SIMON, dissenting:

The State was permitted, over the defendant's objection, to cross-examine the defendant about the contents of a letter he wrote to Katherine De Wulf from prison in which he stated: "I still believe I can escape from here one way or the other." The defendant objected on the ground that the State was introducing proof of another possible crime. The majority concludes that the trial court ruled correctly in allowing the cross-examination because the defendant's statement about escaping from jail "was proper and relevant testimony as tending to

show consciousness of guilt," citing *People v. Gaines* (1981), 88 Ill. 2d 342, *cert. denied* (1982), 456 U.S. 1001, 73 L. Ed. 2d 1295, 102 S. Ct. 2285, and *People v. Harper* (1967), 36 Ill. 2d 398. (122 Ill. 2d at 246.) These two cases, however, involved situations where the defendants actually escaped or attempted to escape. (*People v. Gaines*, 88 Ill. 2d at 366; *People v. Harper*, 36 Ill. 2d at 403.) Here, the defendant was simply writing about the possibility of leaving prison sometime in the future. He may have meant that he thought he would be found innocent and be released or he may have been thinking of escaping because of harsh conditions in prison. In any case, his statement is not relevant to the issue of whether he is guilty of murder, and permitting the State to cross-examine the defendant about the statement was reversible error.

I believe that the trial court also committed a reversible error in admitting De Wulf's prior consistent statement given at the police station on December 12, 1982, the night after the incident. A prior consistent statement is admissible to rebut a charge that the witness has a motive to testify falsely or that her testimony is of recent fabrication where the witness told the same story *before* the motive came into existence or *before* the time of the alleged fabrication. (*People v. Clark* (1972), 52 Ill. 2d 374, 389.) The majority does not apply this principle to the evidence introduced here. Rather, relying on this court's decision in Gacho's codefendant's case, *People v. Titone* (1986), 115 Ill. 2d 413, 423, the court concludes that the statement was admissible because the trial judge "apparently concluded that De Wulf did not have a motive to fabricate when the statement was made." (122 Ill. 2d at 250.) The majority does not identify any motive that De Wulf had to fabricate her trial testimony that did not also exist when she gave her original statement to the police. The defense theory, as evidenced by its cross-

examination of De Wulf, was that she falsely implicated the defendant in order to avoid prosecution for being an accomplice to murder or for possession of cocaine at her residence. As I stated in my dissent in *People v. Titone,* "Since this motive was present, if anything more forcefully, when she made her original statement to the police the night after the incident, the existence of that statement could not rebut the inference created by the defense that she was lying on the stand and served only to improperly bolster her testimony." (115 Ill. 2d at 428 (Simon, J., dissenting).) For the foregoing reasons, I believe that the defendant's conviction should be reversed, and I respectfully dissent.